760 F.2d 1383
 225 U.S.P.Q. 1104
 NATURAL FOOTWEAR LIMITED, A Corporation of the Province of
Ontario Canada,
v.
HART, SCHAFFNER & MARX, a New York Corporation, and Roots,
Inc., a New Jersey Corporation.
ROOTS, INC., A New Jersey Corporation, Counterclaimant,
v.
Don GREEN and Michael Budman, Individuals, and Natural
Footwear Limited, a Corporation of the Province of
Ontario, Canada, Counterdefendants.
Appeal of NATURAL FOOTWEAR LIMITED, Don Green, and Michael
Budman, Plaintiff and Counterclaim Defendants.
NATURAL FOOTWEAR LIMITED, A Corporation of the Province of
Ontario Canada,
v.
HART, SCHAFFNER & MARX, a New York Corporation, and Roots,
Inc., a New Jersey Corporation.
ROOTS, INC., A New Jersey Corporation, Counterclaimant,
v.
Don GREEN and Michael Budman, Individuals, and Natural
Footwear Limited, a Corporation of the Province of
Ontario, Canada, Counterdefendants.
Appeal of HART, SCHAFFNER & MARX and
Defendant-Counterclaimant Roots, Inc.
 Nos. 83-5883, 84-5002.
 United States Court of Appeals,
Third Circuit.
 Argued July 20, 1984.
Decided April 19, 1985.
Rehearing Denied May 30, 1985.
As Amended May 31 and June 27, 1985.
 
 John T. Dolan (argued), Arnold B. Calmann, Crummy, Del Deo, Dolan & Purcell, Newark, N.J., Baker & McKenzie, Chicago, Ill., John T. Dolan, Newark, N.J., Horst H. Werder, Chicago, Ill., Richard S. Zackin, Arnold B. Calmann, Brian J. McMahon, Newark, N.J., Leslie Bertagnolli, Chicago, Ill., On the Brief, for Natural Footwear, Ltd., Don Green & Michael Budman.
 W. Thomas Hofstetter (argued), Patricia S. Smart, Pattishall, McAuliffe & Hofstetter, Chicago, Ill., William J. Heller, Stryker, Tams & Dill, Newark, N.J., for Hart Schaffner & Marx, and Roots, Inc.
 Before SLOVITER and BECKER, Circuit Judges, and FULLAM, District Judge.*
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This is a trademark infringement case in which two business concerns vie for the sole right to use the mark ROOTS for footwear and wearing apparel. Roots, Inc. ("Roots") is a northern New Jersey retail clothing operation which sells high quality clothing in several stores in northern New Jersey, and which has a scattering of mail order customers throughout the nation. Natural Footwear Limited ("Natural"), the other contending party, is a Toronto and Detroit-based footwear and apparel manufacturer which came into prominence in the 1970's by reason of its "Earth Shoe," a negative heel shoe which was the subject of a health fad. Natural registered the mark and opened numerous retail stores across the country, developed a high sales volume, and placed a large volume of advertising nationwide. Roots, however, claims that it has obtained common law trademark rights superior to the rights that flow from Natural's federal registration because of its prior use of the mark.
 
 
 2
 After trial, on the theory that Roots had prior rights to the ROOTS mark and that the mark, as applied to Roots' products, had already acquired secondary meaning in a national market, the district court awarded Roots a permanent nationwide injunction against Natural's use of the trademark ROOTS, ordered cancellation of Natural's federal registrations, and awarded Roots an accounting of Natural's profits. The court denied Roots' request for counsel fees. 579 F.Supp. 543. Natural has appealed, and Roots has cross-appealed.
 
 
 3
 We conclude that the district court's decision was without basis in fact or law; that Roots is a local New Jersey clothier whose advertising was primarily local in character and whose market penetration outside of New Jersey was, as a general matter, de minimis at the time of Natural's registration; that the district court's grant of a nationwide injunction constitutes a clear abuse of discretion; and that its award to Roots of an accounting of Natural's profits outside of New Jersey was completely unjustified, as was its cancellation of Natural's registered trademarks. We also will remand so that an appropriate injunction may be entered in favor of Natural and so that the district court may consider more fully the common law rights of the parties to use the ROOTS trademark on clothing. The denial of Roots' request for attorney's fees will, however, be affirmed.
 
 
 4
 We turn now to a summary of the facts underlying this case, which are central to its understanding.[1] Following this, we will describe the procedural history leading to the present appeal.
 
 I. FACTS
 A. Roots: Its Mark and Merchandise
 
 5
 Roots, a retail clothing chain catering to what its president Perry Root, son of founder Adolph Root, refers to as an "upscale" clientele, began doing business in Jersey City in 1917. A second store was soon opened in Bayonne. These stores were relocated to Summit, New Jersey, in 1931.
 
 
 6
 Roots sells men's and women's clothing and shoes manufactured to its specifications by companies such as Hathaway, Hickey Freeman, Southwick and Gant. In 1950, Roots began applying permanent woven labels bearing the ROOTS name to this merchandise. Fifty percent of the merchandise sold by Roots over the past 20 years carried the "Roots" label alone; an additional 30 percent bore the ROOTS label along with a less prominent manufacturer's label.
 
 
 7
 Since 1965, Roots has been a wholly owned subsidiary of Hart, Schaffner and Marx, Inc. ("HSM"), under the name "Roots, Inc."[2] In 1969, with the opening of a shoe store in Summit, and a store in Red Bank, Roots began to expand in northern New Jersey. The stores in Summit, including the shoe store, and in Red Bank were the only Roots stores open in 1973 when Natural registered the mark "ROOTS" and entered the footwear market in the United States. In 1977, Roots opened stores at the Riverside Mall in Hackensack, and in Morristown (both in New Jersey). In an attempt to improve its ability to compete with stores such as Brooks Brothers, and to pave the way for further expansion in New Jersey, Roots opened a store in Short Hills in 1981. With the exception of one or two occasions when merchandise from Roots was sold in Filene's basement in Boston, and an unsuccessful attempt to sell ties bearing the ROOTS label through other stores owned by HSM, only Roots stores have sold merchandise bearing the ROOTS label. As of 1983, there were five Roots stores in operation, all in northern New Jersey.[3]
 
 
 8
 1. Geographical Extent and Volume of Roots' Out-of-State Sales
 
 
 9
 Roots' total sales, which include a small percentage of sales to out-of-state customers, increased steadily though usually modestly, each year from 1965 to 1982 when they amounted to $11,328,924. But in none of the years during this period for which documentation exists did Roots' sales to out-of-state customers amount to more than three percent of its total annual sales. Roots' out-of-state sales are attributable mainly to credit card purchases and mail orders for merchandise advertised in the Roots catalogue. Roots began to publish the catalogue, which remains its major national advertising effort, in 1956. At the same time it established a list of persons to whom the catalogue is regularly mailed. The mailing list includes names of Roots' credit card holders, persons who make purchases with cash or major credit cards, and persons who simply request that their names be added to the list.[4]
 
 
 10
 Roots produced a computerized version of its mailing list for the years 1976 and 1980. The list includes 40,899 addresses from 43 states including New Jersey. Of that total 38,392 are New Jersey addresses. New Yorkers comprise the next largest group, with addresses of 1,093 catalogue recipients on the list. The only other significant concentrations of addresses are from Pennsylvania, Connecticut, and Florida. Each of these states is represented by fewer than 275 addresses. The 1980 list includes addresses from every state except Wyoming, but from many states there are only a handful. The preponderant number is from New Jersey. A much smaller number of addresses is from the metropolitan area of New York City. Many of the addresses identify former northern New Jersey customers who have moved to other states.[5] These lists are not customer lists. Roots has no systematic process for purging from the list names and addresses of those who have not made purchases within any particular period of time. An address is not deleted from the list unless mail is returned.
 
 
 11
 The Roots catalogue is intended primarily to acquaint customers with the store's new merchandise, but Roots does not regard itself as a mail order store. Its catalogues bear this out: they urge recipients to visit Roots in New Jersey and shop there. Some of the brochures, however, also list a 201 (northern New Jersey) area code phone number to which orders may be placed. Over half of the catalogues for the years 1956-1983 make no reference to either phone or mail orders.[6] Only the 1960 and 1979 catalogues contain actual mail order forms. Though it has no documentation, Roots attributes between $250,000 and $500,000 annually to mail order sales from out-of-state customers.
 
 
 12
 In the mid-1960s Roots began to issue its own credit card.[7] From 1965 until 1975, when the information was completely transferred to a computer, Roots maintained the names and addresses of its credit card holders in giant Rolodex files. Before its use was discontinued, the Rolodex contained approximately 25,000 names of Roots credit card holders residing both in and out of New Jersey. Each card stated the date when the Roots account was opened, and any change of address along with a date. Prior to 1974, there were 1,108 entries listing out-of-state addresses, with 544 of these cards showing a change from a former New Jersey address. Before the information was completely transferred to a computer, the Rolodex contained 1,432 cards bearing out-of-state addresses, with 620 cards showing a prior New Jersey address. The out-of-state addresses are from 46 states, with the major concentrations of these from New York, Pennsylvania, Connecticut, and Florida.[8]
 
 
 13
 Although the Rolodex file was intended to include names of active credit card holders, Roots has no way of knowing when its card holders last made purchases and is unable to determine whether a card has ever been used. The credit cards do not expire automatically. Roots does not attempt to purge the Rolodex file of the names of card holders who fail to make purchases within a particular period of time. A Rolodex card was marked with the notation "inactive" only when a customer requested that his account be closed.
 
 
 14
 The only monthly statements from Roots' credit card sales in existence for any year prior to 1976 are from the months of November and December 1973, and January 1974.[9] Sales during these holiday season months typically account for 50 percent of Roots annual net profit, and 40 percent of its annual sales volume. Roots' credit card sales typically account for about 75 percent of its annual sales, but the number of cash sales during the holiday season is higher than during any other time of year. For the period of November 26, 1973 to December 22, 1973, purchases in the amount of $3,299 representing 1.58 percent of Roots' credit card sales for that month were attributable to customers from nine states outside of New Jersey. Sales to New Yorkers account for $2,556; more than two-thirds of that total. Sales to out-of-staters from December 24, 1973, to January 26, 1974, amounted to $4,544, or 1.70 percent of Roots' credit card sales for the period; purchases were made by residents of 15 states. New Yorkers purchased $1,216, and customers from Pennsylvania, Rhode Island, and Massachusetts account for the only other purchases in even modest dollar amounts.
 
 
 15
 An analysis of all slips available for the year 1976 shows sales to customers from 30 states and the District of Columbia in the amount of $72,820, accounting for 1.71 percent of the $4,250,000 total sales represented by these slips. Two hundred customers from New York made the most significant contribution to the total of out-of-state sales, accounting for 50 percent of the dollar amount of those sales for 1976. Fifty-five customers from Pennsylvania purchased merchandise worth $10,000. Residents from Florida, Connecticut, and Ohio each accounted for sales in amounts over $2,500.
 
 
 16
 Sales slips from 1977 show out-of-state sales in the amount of $198,175. Sales were made to customers in 43 states and the District of Columbia; purchases by New Yorkers rose to $118,385 that year.[10] In contrast, total sales for 1977 amounted to $6,943,596. In 1979, Roots' total sales amounted to $8,601,904 with sales made to customers in 39 states and the District of Columbia, but the records only show out-of-state sales in the amount of $105,310. Figures on out-of-state sales for intervening and subsequent years were not available.[11]
 
 2. Roots' Advertising
 
 17
 a. Local Advertising
 
 
 18
 Since the 1950s, Roots has advertised consistently and extensively in local New Jersey newspapers.[12] Roots' earliest local ads, dating from the mid-1950s, pictured merchandise sold at "Root's," a "Clothier[ ] to gentlemen and their sons."[13] Many of these ads also included the name of the merchandise manufacturer. The ads appeared at least weekly, sometimes more frequently. As Roots grew in New Jersey, it expanded the list of newspapers in which it advertised to include those with subscribers residing in the vicinity of its new stores.
 
 
 19
 Since 1969, Roots has advertised in eight or nine New Jersey papers yearly. In 1972, Roots began running some of the same ads featured in local papers in the New Jersey edition of the Sunday New York Times.[14] In 1973-1974, when Natural registered the ROOTS mark, Roots was advertising locally in The Item of Milburn and Short Hills, The Summit Herald, The Independent Press, The Daily Register of Red Bank, the Asbury Park Evening Press, the Madison Eagle, the Chatham Courier, and the Sunday New Jersey edition of the New York Times. From 1977-1983, Roots also advertised in the New Jersey Monthly magazine, 98 percent of whose subscribers reside in New Jersey. Some of the ads solicited phone orders or requests for Roots' Christmas Catalogue.
 
 
 20
 b. National Advertising
 
 
 21
 Roots has never advertised extensively in the national media. In the late 1940s it placed small ads in the Christian Science Monitor once or twice yearly, and then increased the frequency of these ads to once monthly in the 1950s. The ads from this latter period displayed merchandise which could be purchased at Roots, and often listed the name of the manufacturer. Roots did not advertise in any other national media outlet until 1959 when it began placing ads in the New Yorker. Roots has no separate budget for national advertising and allots only a very small portion of its advertising budget thereto, typically around three percent. During the representative years of 1978-1982, this amounted to national advertising expenditures of between $250,000 and $350,000 annually, and most of that allotment was spent in the production of a Roots catalogue.
 
 
 22
 In an effort to acquaint the "upscale" customer in New York City and other urban and suburban areas with its name, Roots ran ads in the New Yorker during the years 1959-1962. These ads appeared between 12 and 13 times per year.[15] After a four year hiatus, Roots again ran ads in the New Yorker during the last four months of 1966.
 
 
 23
 In 1977, a single co-operative ad, partially paid for by Graham and Gunn, Ltd., appeared in the New Yorker, featuring the names of Roots and Graham and Gunn. Since 1977, the Roots name has appeared in the New Yorker only in manufacturers' ads. These ads, paid for by manufacturers, indicate where their merchandise may be purchased. One manufacturer listed in its ads only Roots as a retail outlet for its product, although these ads typically listed Roots along with several other stores. Manufacturers' ads listing Roots as a retailer have also occasionally appeared in Time, Gentleman's Quarterly and the Wall Street Journal. At the time Natural registered its mark, however, Roots had not placed any advertisements in a national periodical, with the exception of the monthly ads in the Christian Science Monitor, for a period of seven years.
 
 B. Natural: Its Mark and Merchandise
 
 24
 Natural Footwear Ltd., founded in Toronto, Canada, by two Americans Michael Budman and Don Green, began manufacturing a negative heel or "earth" shoe designed to appeal to the health oriented market early in 1973. Natural chose ROOTS as the trademark for its wares that same year. Natural filed applications to register the trademark ROOTS in Canada in May 1973, and in the United States in August 1973.[16] United States Trademark Registrations for the trade mark "ROOTS" and for the trademark "ROOTS NATURAL FOOTWEAR & Beaver Design"[17] were issued on October 15, 1974, and April 8, 1975.[18] The trademark ROOTS appears on Natural's entire product line which, by 1983, included not only shoes, but also leather goods and wearing apparel. Natural's shoes bear the ROOTS mark on the outer sole, and the beaver design with the ROOTS mark on the inside of the shoe.
 
 
 25
 Natural opened its first shoe store in Toronto in August 1973, and its second store in Montreal in December of that year. Natural began shipping shoes to the United States in December of 1973, and opened its first U.S. store in Berkeley, California, the following January.[19] During the first six months of 1974, Natural opened eight additional stores in the United States. These stores were called either "ROOTS" or "ROOTS Natural Footwear" and sold only ROOTS merchandise: earth shoes, T-shirts, and shoe care products. During the second half of 1974, Natural opened eight more stores in the United States. By the end of 1974, there were ROOTS or ROOTS Natural Footwear stores in Arizona, California, Colorado, Florida, Illinois, Michigan, New Mexico, New York, Oregon, and Washington. All stores which opened in 1974, with the exception of one in New York City run by Budman and Green, were franchise stores.[20]
 
 
 26
 In 1975, Natural opened an additional 29 shoe stores located throughout the United States. By the end of 1975, the peak year for Natural's shoe stores, 46 stores were doing business in 22 states. Ten of these stores were company stores run by Budman and Green; the remainder of the stores were run by franchise owners.[21]
 
 
 27
 In 1976 Natural's shoe stores began to close. By 1979, only 10 ROOTS Natural Footwear stores remained open in the United States, even though Natural had opened 10 stores in five states in 1976, two stores in 1977, and one store in 1978. An additional six stores remained open but had changed their names, and began to distribute products made by other manufacturers in addition to Natural's shoes. When its shoe stores began to close in 1976, Natural expanded its product line to include leather handbags and conventionally styled shoes and began distribution through retail department stores. Saks began selling handbags manufactured by Natural in 15 of its stores, including its branch in Springfield, New Jersey. In the Fall of 1977 Saks began selling conventionally styled shoes manufactured by Natural; Saks was joined by Nordstroms' and Bloomingdale's in 1978. In 1979, at Saks' suggestion, Natural created a line of clothing, including jackets, jeans, and shirts.
 
 
 28
 Natural's clothing sales in the United States were limited by a preliminary injunction entered by the district court in this case in December 1979, forbidding the sale of clothing manufactured by Natural bearing the trademark ROOTS. By 1983, Natural was devoting 40 percent of its manufacturing capacity to the production of wearing apparel, sold in Europe under the ROOTS label, and 60 percent to the production of shoes. Natural's shoes and shoe care products were being sold at retail department stores, including Saks, Macy's, and Bergdorf Goodman, and by 50 independent shoe stores.
 
 
 29
 1. Geographic Extent and Volume of Natural's Sales
 
 
 30
 In 1974, the year Natural opened its first 17 stores in the United States, wholesale sales were approximately $866,000.00 while retail sales were approximately $2.3 million. In 1975, Natural's banner year, wholesale sales reached a high of $3.7 million. The table below shows the geographic distribution of the 1975 sales.
 
 
 31
 State Sales State Sales
Alabama $ 46,584.50 Minnesota $ 61,157.59
Arizona 91,501.74 Missouri 36,023.93
Arkansas 8,497.37 Nevada 93,413.48
California 743,993.05 New Mexico 73,166.10
Colorado 100,791.63 New York 240,608.87
Connecticut 17,085.46 Ohio 32,476.10
Florida 1,401.72 Oregon 156,308.44
Georgia 26,277.61 Pennsylvania 95,088.80
Illinois 85,790.48 Texas 245,691.46
Massachusetts 130,892.89 Washington 86,365.87
Michigan 423,555.04 Wisconsin 100,785.93
 
 
 32
 At that time Natural had six stores in California, four each in Florida and New York, three each in Illinois, Michigan, and Texas, and two each in Massachusetts, Oregon, and Pennsylvania. In each of the other states represented, one ROOTS Natural Footwear store was doing business.
 
 
 33
 From 1976, when its stores began to close, until 1982, sales generally declined, with some fluctuation. By 1978 Natural's sales had dropped to approximately $1.5 million. Sales climbed to $2 million in 1979, dropped again to approximately $1.5 million in 1980, and remained at about $1.5 million in 1981. Sales for 1982 were $1.9 million. Natural's total wholesale sales for the period 1973-1982 were approximately $18 million.
 
 2. Natural's Advertising
 
 34
 Natural has advertised extensively and consistently in both local and national media since it began doing business in the United States. In 1974, when Natural entered the American footwear market, it hired the advertising firm of Burns and Cooper to produce newspaper ads which were mailed to franchise owners for publication in local newspapers. In 1975, Natural retained the firm of Lord, Geller, Frederico, Inc., to plan a national advertising campaign. For the period July 1975 to January 1976, Natural spent approximately $360,000 on television ads and on ads in five major newspapers and twelve periodicals with national circulation.[22] The advertising placed by Natural and Century was supplemented by franchise stores which spent five percent of gross annual sales, averaging $200,000 for each store, on advertising.[23] From 1975 to 1983, Natural continued to advertise in major newspapers, national magazines, and trade journals.[24] In 1977 Natural began to engage in co-operative advertising in regional and national newspapers and periodicals, with the department stores such as Saks and Macy's which sell its products.
 
 II. PROCEDURAL HISTORY
 
 35
 In October 1979, after it had received indications from Roots that Roots intended to sue, Natural filed a complaint in the District Court for the District of New Jersey requesting a declaratory judgment regarding the validity of its federal trademark registrations as authorized by 15 U.S.C. Sec. 1119 (1982). The complaint alleged unfair competition, infringement of a registered mark, and false designation of origin in violation of the Lanham Act, 15 U.S.C. Sec. 1125(a) (1982). Natural sought a permanent injunction against further use of the mark ROOTS by Roots outside of New Jersey.[25]
 
 
 36
 Roots counterclaimed, alleging unfair competition, trademark infringement, and false designation of origin, and seeking a permanent injunction forbidding the use by Natural of the mark ROOTS on footwear and wearing apparel. Roots also sought a preliminary injunction forbidding Natural from expanding its use of the mark ROOTS to wearing apparel, pending trial.
 
 
 37
 In December 1979, after a brief hearing, including the submission of documentary evidence, the district court granted a nationwide preliminary injunction against the use by Natural of the mark ROOTS on wearing apparel. Natural appealed, and moved for a temporary modification of the injunction, limiting it to New Jersey and New York. Temporary modification of the injunction was granted by a motions panel of this Court on December 19, 1979, and the grant of the preliminary injunction, as modified, was affirmed by the motions panel on December 26, 1979. In April 1980, a merits panel vacated the temporary modification and affirmed the original nationwide preliminary injunction. Natural Footwear Ltd. v. Hart, Schaffner & Marx, 620 F.2d 289 (3d Cir.1980) (judgment order). The matter then returned to the district court for final hearing.
 
 
 38
 In 1983, after three years of discovery, the matter became ripe for disposition. The parties filed cross-motions for partial summary judgment on the issue of the validity of Natural's trademark registrations. On August 13, 1983, the district court ruled in favor of Roots but did not order the PTO to cancel Natural's trademarks, because the ruling was only a partial disposition of issues later presented at trial. 577 F.Supp. 128. In December 1983, the district court adjudicated the remaining issues in favor of Roots. In findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), it found that Roots had acquired a national reputation for its name and mark before Natural entered the market in 1973 and that confusion concerning the origin of goods bearing the mark ROOTS was likely to result. The court granted a permanent nationwide injunction forbidding use by Natural of the mark ROOTS in connection with the manufacture or sale of wearing apparel and footwear; ordered an accounting of Natural's profits from the second half of 1977 until such time as the mark ROOTS is eliminated from all goods Natural produces; and directed cancellation of Natural's federal trademark registrations. The court also concluded that it was not authorized to award attorneys' fees under 15 U.S.C. Sec. 1117. Natural appeals, seeking reversal of the district court's judgment and an order enjoining Roots from the use of the mark ROOTS on wearing apparel and footwear. Roots cross-appeals on the attorney's fees question.
 
 III. RELATIVE RIGHTS IN THE ROOTS MARK
 A. General Principles
 
 39
 There is a single overarching issue in this case: what is the territorial extent of the right of each party to use the ROOTS mark. See Weiner King, Inc. v. Wiener King Corp., 615 F.2d 512 (C.C.P.A.1980).[26] Natural contends that the district court erred when it enjoined Natural's use of the ROOTS mark throughout the nation. Roots argues that the injunctive relief ordered by the district court was appropriate because Roots was the senior user of the mark and had achieved nationwide market penetration among the target group of purchasers.
 
 
 40
 In the venerable case of Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916), the Supreme Court laid down the basic principles governing the territorial rights of trademark holders under the common law. The Court held that the trademark of a prior user should be protected from infringement by a subsequent user of the same mark only in areas where the prior user has established a market for its goods:
 
 
 41
 Since it is the trade, and not the mark, that is to be protected, a trademark acknowledges no territorial boundaries of municipalities or states or nations, but extends to every market where the trader's goods have become known and identified by his use of the mark. But the mark, of itself, cannot travel to markets where there is no article to wear the badge and no trader to offer the article.
 
 
 42
 Id. at 417, 36 S.Ct. at 362. Thus, the senior user of a common law mark may not be able to obtain relief against the junior user in an area where it has no established trade, and hence no reputation and no good will. We have more recently taken this approach in a case involving a nationally registered trademark. In Holiday Inns of America, Inc. v. B & B Corp., 409 F.2d 614, 617 (3d Cir.1969), we concluded that use and registration of a mark do not guarantee that injunctive relief will be available to protect the senior user in all areas of the country, as the marks must be "at large in the same market place and compete for the same customers."
 
 
 43
 With this understanding of the policies that underly the geographic protection of trademarks, we now consider in detail the rights of Natural and Roots, in regard to their claim and counterclaim for broad injunctive relief.
 
 
 44
 B. The Rights Resulting from Federal Registration of the ROOTS Mark; Roots' Defense of Senior Use and the Propriety of the Nationwide Injunction on Roots' Putative Common Law Rights
 
 
 45
 Natural originally brought suit in the district court to enforce the rights it believed it had gained by its 1973 registration of and use of the ROOTS mark. The rights accorded a holder of a registered federal trademark are, in fact, substantial. In Burger King of Florida, Inc. v. Hoots, 403 F.2d 904 (7th Cir.1968), the court outlined these rights, stating that a federal registrant has the right to use the trademark in commerce "except to the extent that such use infringes what valid right the defendants have acquired by their continuous use of the same mark prior to plaintiffs' federal registration." Id. at 907. Accord Armand's Subway, Inc. v. Doctor's Associates, Inc., 604 F.2d 849, 850 (4th Cir.1979); cf. In re Beatrice Foods Co., 429 F.2d 466, 472, 57 CCPA 1302 (1970) ("Rights of trademark ownership, for example, the right to enjoin another from use of the mark, must be based upon actual use and can be enforced only in areas of existing business influence.... [T]he Lanham Act did not alter this aspect of the prior law.").
 
 
 46
 As the Hoots court explained, the scope of federal trademark protection differs significantly from the scope of common law protection:
 
 
 47
 Congress expanded the common law ... by granting an exclusive right in commerce to federal registrants in areas where there has been no offsetting use of the mark.... Congress intended the Lanham Act to afford nation-wide protection to federally-registered marks, and that once the certificate has issued, no person can acquire any additional rights superior to those obtained by the federal registrant.
 
 
 48
 403 F.2d at 908. See also Armand's Subway, Inc. v. Doctor's Associates, Inc., 604 F.2d 849, 849 (4th Cir.1979) ("After the Lanham Act, nationwide protection was extended to registered marks, regardless of the area in which the registrant actually used the mark, because under 15 U.S.C. [Sec.] 1072 registration constituted constructive notice to competing users.").
 
 
 49
 Registration of a trademark, in addition to serving the interests of the registrant by providing constructive notice, serves the interests of other participants in the market place. Entrepreneurs, for example, who plan to promote and to sell a new product under a fanciful mark, should be able to rely on a search of the trademark registry and their own knowledge of whether the mark has been used so that what may be substantial expenditures of money promoting the mark will not be wasted. Consumers are also benefitted by the registration of national trademarks, because such registration helps to prevent confusion about the source of products sold under a trademark and to instill in consumers the confidence that inferior goods are not being passed off by use of a familiar trademark. In short, therefore, the benefits of prior registration under the Lanham Act are justified in light of the order such registration brings to the market place. See Weiner King, Inc. v. Wiener King, Corp., 615 F.2d 512, 523-24 (C.C.P.A.1980).
 
 
 50
 As our discussion indicates, Natural's federal registration does not necessarily establish a nationwide right to use the ROOTS mark on footwear, accessories, and clothing. Natural's rights under the Lanham Act depend, first, on the terms of its registration which establish as an initial matter the scope of protection of the mark. Second, as we discussed above, Natural as a federal registrant is still subject to the defense of a prior user of the mark who has established a market in specific areas notwithstanding that senior user's failure to register.
 
 1. The Scope of the Federal Registration
 
 51
 The Lanham Act provides that the protection afforded by registration extends to "the goods or services specified in the registration subject to any conditions or limitations stated therein." 15 U.S.C. Sec. 1115(a). The Second Circuit has concluded that, given this language, "even if a mark is registered, the presumptive right to use it extends only so far as the goods or services noted in the registration certificate." Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 48 (2d Cir.1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); see also Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, 613 n. 7 (2d Cir.), cert. denied, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960).[27] The Avon Shoe court also stated in this regard that "incontestability under [section 1065] would carry a conclusive presumption of the plaintiff's exclusive right to use its mark only on shoes,"[28] when the registration indicated only that the trademark would identify shoes. Id. (dictum).
 
 
 52
 Unlike the Second Circuit, the Court of Customs and Patent Appeals has apparently decided that federal registration of a trademark may protect products that are not specifically identified in the registration. In Key Chemicals, Inc. v. Kelite Chemicals Corp., 464 F.2d 1040, 1043, 59 CCPA 1231 (1972), the court concluded that:
 
 
 53
 a trademark owner cannot by normal expansion of its business extend the use of its trademark to goods not covered by its previous registration, where the result would be a likelihood of confusion caused by similarity of that mark to a mark already registered by a prior user for the same or similar goods.
 
 
 54
 Id. (emphasis added). The court, however, did not consider the language of the Lanham Act or its underlying policies.
 
 
 55
 We conclude that the Second Circuit's approach is correct based on both the statutory language construed by that court as well as the purpose of the statute.[29] We have already explained how the Lanham Act is intended to order the use of trademarks in the market place. We believe that this purpose is best served by limiting the impact of a registered mark to only the specific terms of the registration so as to allow parties interested in marketing products with a new mark to rely as fully as possible on the registry. This rule, unlike the rule adopted in Key Chemicals, will appropriately encourage registrants who wish to receive the full scope of the Act's protection in regard to the new use of the mark to file a new application covering the new products and making reference to the earlier registration once they begin to sell a new line of products under their registered mark. Additionally, we believe that the grant of a form of monopoly[30] should not be liberally construed. See Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1231 (3d Cir.1978) (" 'The right granted to the owner of a registered trademark is a monopoly and should not be extended unless the owner is clearly entitled thereto.' " (quoting S.C. Johnson & Son, Inc. v. Johnson, 266 F.2d 129, 136 (6th Cir.), cert. denied, 361 U.S. 820, 80 S.Ct. 65, 4 L.Ed.2d 65 (1959)).
 
 
 56
 We turn then to the scope of Natural's national trademark rights. The registration issued to Natural by the United States Patent & Trademark Office indicates that the ROOTS mark is to be used for "FOOTWEAR--NAMELY, SHOES, SLIPPERS AND BOOTS." Because claims I and II of Natural's complaint seek relief based on the federal registration of the ROOTS mark, Natural is only entitled to gain relief pursuant to the Lanham Act in regard to its marketing of footwear.[31]
 
 
 57
 2. Prior Use of the Trademark by Roots; Propriety of the Nationwide Injunction
 
 
 58
 As our discussion above indicated, the Lanham Act provides that a senior user of a trademark has a defense against a later good-faith federal registrant which "shall apply only for the area in which ... continuous prior use is proved." 15 U.S.C. Sec. 1115(b)(5). The extent to which Roots has a defense against Natural's use of the ROOTS mark outside of New Jersey is fiercely contested.[32] The district court concluded that by the time of Natural's trademark registrations, Roots had achieved a national reputation for its sales of quality clothing and footwear. The district court stated in this regard that:
 
 
 59
 the evidence as a whole clearly and convincingly shows that Roots had established and continues to enjoy unique identification for the wearing apparel (including shoes) sold by it as a merchant, both as a tradename and as a trademark, mainly in New Jersey but throughout the United States as well, long before Natural's first shipment of shoes to California in late December, 1973. Roots is undoubtedly the senior user.
 
 
 60
 Appendix at 938a. Based on this senior use throughout the country, the district court enjoined Natural's use of the ROOTS trademark throughout the country and ordered a cancellation of its federal registrations.
 
 
 61
 Before reviewing the district court's decision regarding Roots' national reputation, it is important to recall our conclusion in Scotts Liquid Gold that, because awarding ownership of a mark gives the relevant company a monopoly over the use of that mark in the prescribed area, the party asserting ownership must make a showing of "clear entitle[ment]." 589 F.2d at 1231. Another court has held in similar terms that a party should be awarded ownership of a mark in a specific geographic area only when the party's mark has achieved market penetration that is "significant enough to pose the real likelihood of confusion among the consumers in that area." Sweetarts v. Sunline, Inc., 380 F.2d 923, 929 (8th Cir.1967), quoted with approval in Sweetarts v. Sunline, Inc., 436 F.2d 705, 709 (8th Cir.1971).
 
 
 62
 In the instant case, the district court based its conclusion that Roots had achieved a national reputation on (a) its evaluation of the growth of Roots' sales to out-of-state customers over the course of several years; (b) its conclusion that Roots' advertising was consistent with its status as a nationally known store serving individuals interested in quality clothing; and (c) its finding that Roots had "achiev[ed] sales of its goods, under its name and mark throughout the United States." Appendix at 938a.
 
 
 63
 The district court was correct in evaluating the extent of Roots' market penetration as of late 1973, the period in which Natural initially registered its mark. See Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1231-32 (3d Cir.1978). We conclude, however, that the district court's decision about the extent of Roots' reputation cannot be sustained for three reasons. First, the court failed to consider Roots' market penetration in regard to specific market areas. This failure to scrutinize the extent of Roots' sales, advertising, and reputation on either a state-by-state or region-by-region basis is, we believe, inconsistent with the language of the Lanham Act, see 15 U.S.C. Sec. 1115(b)(5) (defense of prior use applies "only for the area in which ... continuous prior use is proved." (emphasis added)), as well as the proposition that a common law mark is to receive no greater protection than its reputation in any specific area warrants. See generally Sweetarts v. Sunline, Inc., 380 F.2d 923 (8th Cir.1967).
 
 
 64
 More significant than this error, however, was the district court's failure to assess Roots' market penetration on the basis of factors probative of such penetration. Although this court has not established a test for determining whether a party's reputation in a given state or region is sufficient to warrant injunctive relief for protection against the use of a confusingly similar mark in that area, two courts have developed tests that fully and accurately assess the extent of the mark's market penetration. The district court applied neither these tests nor anything comparable, and, in fact, failed in drawing its conclusion to consider the most important indicia of market penetration. Finally, under the correct test, the record simply will not support the district court's conclusion.
 
 
 65
 In the well-known case of Sweetarts v. Sunline, Inc., 380 F.2d 923 (8th Cir.1967), the court identified the following four factors as being most relevant to whether a mark has achieved the necessary quantum of market penetration in a given area: the senior user's dollar value of sales at the time the junior user enters the market; the number of customers of the senior user in the area compared to the area's total population; the senior user's relative and potential growth in sales; and the length of time since significant sales were achieved in the area. Id. at 929.
 
 
 66
 The Court of Customs and Patent Appeals in the equally well-known Weiner King, Inc. v. Wiener King, Corp., 615 F.2d 512 (C.C.P.A.1980) fixed upon five factors as relevant to assessing the market penetration of a trademark user. These factors were the following: the user's previous business activity in the area; previous business expansion in the area or lack thereof; dominance of contiguous areas; presently planned expansion; and, where applicable, possible market penetration by means of products brought in from other areas. Id. at 522 (adopting factors originally identified in In re Beatrice Foods Co., 429 F.2d 466, 475, 57 CCPA 1302 (1970)).
 
 
 67
 We agree with the approach of the courts in Sweetarts and Weiner King[33] and believe that the following four factors should be considered to determine whether the market penetration of a trademark in an area is sufficient to warrant protection:[34] (1) the volume of sales of the trademarked product;[35] (2) the growth trends (both positive and negative) in the area;[36] (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area. When we evaluate the district court's decision in regard to these factors, the insufficiency of its reasoning is readily apparent.
 
 
 68
 With regard to sales, we have concluded that a court needs to consider the volume of sales in any given area, as well as the growth trends those sales indicate. The district court's discussion of actual sales by Roots outside of New Jersey was largely limited to the comment that sales were made throughout the country, Appendix at 938a, and to the observation that "[w]hile the percentage of out-of-state sales is a fraction of store sales, the business is there, it is steady and it has grown." Id. at 935a.[37] The court was more convinced by the fact that Roots' sales to customers had tripled in five states and had doubled in another.[38] Such growth is, as we have stated, important to a complete analysis of market penetration. Without reference to the sales volume itself, however, the rate of growth in sales loses much of its probative power: A tripling in sales in a given area may be more properly attributable to new purchasing patterns for the same, very small group of buyers than to a marked increase in the products' market penetration. In short, the court's discussion of sales was not sufficiently detailed to support its broad conclusions.
 
 
 69
 The district court did engage in a brief evaluation of Roots' customers. See id. at 937a. The court pointed out, for example, that the number of people interested in the high-quality clothing offered by Roots is small in relation to the total population of a given area. The court then concluded that Roots was actually well known among this small group of people. See id. at 937-38a. We agree with the district court that a proper evaluation of market penetration should normally include a comparison of the number of actual consumers of the trademarked product with the number of people in the market for the product, rather than with the full population of a given area. The district court was not able to engage in a detailed analysis of this type, however, because Roots, on whom the ultimate burden of proof rests, failed to present direct evidence identifying the relevant group of consumers. Additionally, the district court's analysis is insufficient because it did not discuss the other possible indicia of the number of Roots' customers, credit card listings and the mailing list, in arriving at its conclusion.
 
 
 70
 Neither the Sweetarts court nor the Weiner King court expressly stated that the advertising of a product in a given area should be considered when evaluating its market penetration. The extent of advertising is, however, implicit in Weiner King's conclusion that "business activity" in an area has to be considered. 615 F.2d at 522. Because advertising may be very important to the reputation of a product in a given area, we conclude that advertising should be recognized as an independent factor for determining market penetration.[39] The district court's conclusions about Roots' advertising consisted largely of an evaluation of the testimony of an expert witness for Natural who had testified about the advertising budget necessary to support nationwide recognition of a product. See Appendix at 936-37a. Although the court's concerns about the testimony may well have been appropriate in light of the smaller group of consumers Roots hoped to reach through its advertising, the court did not undertake any independent evaluation of Roots' advertising.
 
 
 71
 Having determined that the district court's legal analysis of the extent of Roots' market penetration was inadequate, we turn to the question whether Roots had sufficient market penetration outside of New Jersey to justify the injunctive relief ordered by the district court.[40]
 
 
 72
 Our extensive discussion in part I.A., which reflects our review of the Roots' incomplete business records summarized and reproduced from submissions in the district court, see Appendix at 4750-55a,[41] indicates that we must apply the four-factor test in only two states, New York and Pennsylvania. Based on that discussion and review, we conclude that Roots' sales in each of the other states,[42] as evidenced by the number of customers and the value of gross sales, were either so small or so sporadic that market penetration was de minimis. By de minimis, we mean that Roots achieved neither gross sales of over $5,000 nor a total of over 50 customers for any of these states in at least two of the three years for which sales data were available.[43] When sales activity does not exceed even a minimum threshold level, a court may properly conclude that market penetration sufficient to support injunctive relief simply has not been demonstrated. See Sweetarts, 380 F.2d at 929. As these facts make clear, Roots has not made even the threshold showing of market penetration in any states except New York and Pennsylvania.
 
 
 73
 We must consider finally the extent of Roots' market penetration in New York and Pennsylvania. We look first to the extent of sales of the trademarked product(s) in each state. As our discussion of the facts indicates, two sets of Roots records are particularly important to our consideration. First, during the period November 26, 1973, to January 26, 1974, Roots' available records, which report sales to charge account customers, indicate that gross sales of $3772 were made to 39 customers from the state of New York. The records also indicate that gross sales of $561 were made to 8 customers from Pennsylvania. Considering the relative volume of business typically done during this holiday period,[44] the sales figures are singularly unimpressive.
 
 
 74
 The other set of data, gross sales records from calendar years 1976, 1977, and 1979, is more difficult to evaluate. Sales to New York customers of approximately $36,000 were recorded in 1976 out of a total sales volume of $5.60 million (or .64 percent of the year's gross sales). Gross sales in 1976 to Pennsylvania customers totalled about $11,000 (or .20 percent of the year's gross sales). By 1979, however, sales were less than one-half of the 1976 level, or about $5,000.
 
 
 75
 The second factor focuses upon the product's growth trends in the area at the time of the registration of the trademark. Again, our ability to assess Roots' rights to the ROOTS mark is significantly curtailed because Roots has not come forward with evidence of out-of-state sales for the months or years preceding registration of the ROOTS mark in 1973. The post-1973 evidence of out-of-state sales does indicate, as the district court noted, see supra note 37 and accompanying text, that sales to New York customers expanded by a factor of three from 1976 to 1977. This substantial increase may reasonably be attributed to the opening of the Riverside square store. Sales to New York customers then decreased in 1979 by about 40 percent from the 1977 level.
 
 
 76
 We agree that evidence of trends of increased sales of a trademarked product in the years following registration of another, confusingly-similar trademark may in some cases support the conclusion that there was sufficient market penetration of the product in the area at the time of registration. Such a conclusion is unwarranted, however, when the evidence of increased sales does not show a trend that was in progress through the period of registration and is attributable to some factor, independent of the product's reputation, that was not present at the time of registration. In this case, we cannot be sure of the trends in sales at the time of registration, and at all events the increased sales several years after registration may result from the opening of a new store.[45] Thus, Roots has not presented convincing evidence of a consistent and growing reputation in New York at the time of Natural's federal registration.
 
 
 77
 The evidence of growth trends in Pennsylvania also suffers because it does not necessarily reflect Roots' market penetration at the time the trademark was registered. Moreover, even the growth rates presented by Roots fluctuate severely over the three years with the overall trend being less market penetration. In fact, in 1979 sales to Pennsylvanians were virtually at a de minimis level. Thus, the second factor does not support the conclusion that Roots had sufficient market penetration in Pennsylvania or in New York.
 
 
 78
 With regard to the third factor, the number of customers who are purchasing the trademarked product, several of Roots' records are useful. As we outlined in part I.A., Roots has both a computerized mailing list developed after Natural's registration and an older Rolodex file showing the names and addresses of its credit card holders for the period 1965 to 1975. The computerized mailing list includes 1,093 addresses from New York and 260 addresses from Pennsylvania. The Rolodex file of credit card holders includes about 293 addresses from New York and 146 addresses from Pennsylvania. But even the rather modest numbers of individuals included in these two lists, numbers that would standing alone be scant support for a conclusion that Roots had developed a reputation as a quality clothier throughout New York and Pennsylvania, tend to overstate the extent of Roots' reputation.
 
 
 79
 As we have indicated, the mailing list includes the names of credit card holders, of people who make purchases with cash or major credit cards, and of people who request that their names be added to the list. There is no attempt, however, to purge the list so that it includes only names of current customers. In fact, an address is deleted only when mail is returned. The Rolodex listing of addresses of credit card holders has these same limitations: The cards do not expire and a card is marked with an "inactive" notation only when a customer asked that the account be closed. In addition, the Rolodex records indicate that many of the out-of-state customers had formerly been residents of New Jersey. For example, 88 cards or 30 percent of the total number stating New York addresses also state a prior New Jersey address. For current Pennsylvania residents, 39 cards or 26 percent of the total number state a prior New Jersey address. Thus, these two lists may reflect to a substantial degree the mobility of former Roots customers, rather than Roots' market penetration.
 
 
 80
 Roots' incomplete records of sales also provide evidence of the extent to which Roots had customers in New York and Pennsylvania. During the 1973 holiday season, Roots sold goods to 39 credit card customers from New York and to 8 credit card customers from Pennsylvania. In calendar year 1976, Roots sold merchandise to 200 New Yorkers and 55 Pennsylvanians. These numbers hardly reflect substantial market penetration in either of the two states.
 
 
 81
 Roots explains that these rather low figures still indicate a sufficient level of market penetration because it intends to serve only an "up-scale" clientele interested in quality clothing, and the numbers therefore indicate that its reputation has brought these discerning purchasers to its stores. There may be some support for this theory. Roots, however, did not present in this litigation any direct evidence to identify either the size of the relevant market or to indicate the extent to which Roots' reputation was known within that market. In sum, even if we concede the force of Roots' argument, it simply has not met the burden of demonstrating that it has a significant clientele in any area outside of New Jersey.
 
 
 82
 Finally, we must consider the amount of advertising conducted by Roots in New York and Pennsylvania. The record concerning Roots' advertising efforts is well developed, and the parties dispute with substantial vigor the question whether, in fact, Roots' advertising is national in scope. There is no dispute that prior to 1973 Roots advertised periodically in the New Yorker and the Christian Science Monitor. For the seven years immediately before Natural's registration, however, Roots' only national advertising was once monthly in the Christian Science Monitor.[46] The predominant focus of Roots' advertising was its local northern New Jersey market. Thus, Roots advertised in newspapers that were intended to serve local communities, such as The Item of Milburn and Short Hills, The Summit Herald, and the Chatham Courier. Significantly, although Roots advertised in the Sunday New York Times, the ads were placed in only the New Jersey edition. Even the catalogues offered by Roots evidence an overriding concern with local markets. As we have outlined, during the period 1956-1983, over one-half of the catalogues did not make reference to phone or mail orders. In only two years, 1960 and 1979, did the catalogues actually contain mail order forms.
 
 
 83
 Although the type of advertising and promotion undertaken by Roots is not necessarily inconsistent with a reputation outside of the local areas of the Roots stores, such advertising certainly does not compel a conclusion that Roots had become well known among quality-clothing consumers in Pennsylvania and New York. With this relatively low-level emphasis on national advertising, one might have expected Roots to introduce consumer surveys at trial to document that its pre-1973 advertisements could be expected to reach and inform its target audience. Notwithstanding its burden of proof, Roots presented no such evidence.
 
 
 84
 Having considered the four factors, we believe that only one conclusion is possible: Roots has not demonstrated sufficient market penetration in either New York or Pennsylvania to justify a conclusion that it has common law trademark rights in those two areas.[47] We are persuaded in particular by the available evidence of Roots' sales, which indicates that, although Roots' business in the two states was not necessarily de minimis at the time Natural registered its mark, it was also not substantial by any measure. In light of such a low volume of sales, Roots had to come forward with particularly persuasive evidence as to each of the final three factors. However, as we have discussed, Roots failed even to come close to making the necessary showing. Therefore, on this record, the nationwide injunction in favor of Roots' use of the ROOTS trademark cannot stand and the permanent injunction must be vacated.[48]
 
 
 85
 Our conclusion concerning Roots' failure to prove sufficient market penetration outside of New Jersey is consistent with the expert testimony at trial. Natural offered testimony from Drs. Henry Assael,[49] an expert on consumer behavior in marketing, and Steven Osterweis,[50] a retail merchandising expert with years of practical experience. Both experts carefully reviewed the evidence as to the nature of Roots' operation, its advertising efforts, and its sales outside New Jersey, and independently concluded that Roots is a local retail clothing operation which has made no serious effort to extend its business beyond its New Jersey trade area and did not have a national reputation. Roots did not offer evidence to counter the opinions of these experts.[51]
 
 
 86
 3. Relief for Natural Based on Federal Registration of the Trademark on Footwear
 
 
 87
 By reason of its registration of the ROOTS mark, Natural gained the substantial protection afforded by the Lanham Act. For reasons explained above, this protection extends only to the products described in the registration and to areas where there is no senior user with sufficient market penetration. We conclude as a matter of law that Natural's sale of footwear is protected by the Lanham Act in all states except New Jersey, see supra note 32. We, therefore, will reverse that portion of the district court's order directing the PTO to cancel the registrations of the ROOTS mark and will order that the registrations be reinstated. See Appendix at 943a. We also will vacate as to all states outside of New Jersey the portion of the district court's order permanently enjoining Natural from using the ROOTS mark.
 
 
 88
 It also follows from our extensive discussion of the facts relating to Natural's mark in part I.B. that Natural may be entitled to substantial injunctive relief; we must consider finally the extent of the relief to which it is entitled. Natural has sought injunctive relief pursuant only to its rights under the Lanham Act.[52] As an initial matter, we have held that the Lanham Act protects Natural's use of the trademark only on footwear products. In Holiday Inns of America, Inc. v. B & B Corp., 409 F.2d 614 (3d Cir.1969), we discussed the extent to which injunctive relief is available to protect the holder of a registered trademark. We concluded that Holiday Inn was not entitled to enjoin the use in the U.S. Virgin Islands of a federally registered mark by a junior user, even though we decided that Holiday had "superior rights to the trade or service mark ... and that the borrowed use was improper." Id. at 618. We also outlined the considerations that should determine the scope of injunctive relief to be accorded a federal registrant:
 
 
 89
 We must protect that which is protectable, but, in so doing, we must limit the use of injunctive relief to situations where it is necessary to prevent immediate and irreparable injury. The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat; it may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law.
 
 
 90
 Id. In Holiday Inns, the court did not enjoin the junior user's use because there was no present likelihood of confusion regarding the use of the trademark in the Virgin Islands market area. Holiday Inns had no present plans to build a hotel in the Virgin Islands[53] and, in the isolated geographic setting, a likelihood of confusion would exist only at the time of actual expansion into the area by the federal registrant. Id.
 
 
 91
 The district court has not found the facts that are necessary to our fashioning an injunction under the directive of Holiday Inns. We will therefore have to remand the case to the district court with direction to take evidence and to fashion relief in favor of Natural based on its present use of the ROOTS trademark on footwear in accordance with this opinion.[54] As we have outlined in the facts, Natural has done substantial business in many areas of the country so that injunctive relief in its favor is likely to be of wide scope.
 
 
 92
 C. The Post-1973 Common Law Rights to Use the ROOTS Mark on Clothing
 
 
 93
 We have concluded that Natural's use of the ROOTS trademark on footwear is protected because of its federal registration. We have not yet considered in terms the extent of Roots' common law rights to use the ROOTS trademark on clothing.
 
 
 94
 In part III.B., we determined that by the time of Natural's federal registration of the trademark, Roots had not gained common law rights in the ROOTS trademark in any area outside of New Jersey.[55] Thus, if Roots has any common law rights to the use of the trademark on clothing, those rights must result from market activity outside of New Jersey in the post-1973 period.[56] We consider now this possible basis for common law rights.[57]
 
 
 95
 We have already reviewed the post-1973 evidence presented by Roots, and we concluded that only in the states of New York and Pennsylvania did Roots have even a colorable claim to trademark rights.[58] Any such rights would, of course, be based in large part on Roots' sales records from 1977 and 1979, with the case for sufficient market penetration in Pennsylvania being extremely doubtful at best and in New York being limited in all likelihood to the New York City metropolitan area. However, we are unable to determine on the present record whether Roots is entitled to common law protection in these areas for two reasons.
 
 
 96
 First, whether Roots is entitled to a common law trademark on clothing in the areas based on market activity in the 1977-1979 period will depend on whether Roots is the prior user of the trademark in the particular market at that time. Because Roots sought an injunction forbidding Natural's use of the ROOTS mark on wearing apparel, Roots had the burden to show it was the senior user and had achieved a common law trademark with respect to wearing apparel. On the record in this case, however, Roots has not clearly demonstrated that it was the senior user of the trademark.
 
 
 97
 The record indicates that in October 1974 a store selling Natural's footwear opened in New York City and three other such stores opened in the New York metropolitan area in 1975.[59] Stores selling Natural's footwear also opened in 1975 in Pittsburgh (March) and Philadelphia (September). Sales in New York amounted to about $57,000 in 1974, and $241,000 in 1975. Sales in Pennsylvania in 1975 totalled about $95,000.
 
 
 98
 These sales figures are significantly higher than the 1977-1979 sales reported by Roots for the two states and may support, along with data on advertising, sales growth, and relative number of customers, the contention that Natural had gained common law trademark protection for its use of the ROOTS mark on footwear in the New York, Philadelphia, and Pittsburgh metropolitan areas by the end of 1975.[60] If these common law rights in fact existed, they would be critical because of the principle that once one has established a common law trademark in a product, the prior use of that trademark will apply as well to the use of the same trademark on related products in ascertaining priority of use.[61] See J.C. Penney Co. v. Security Tire & Rubber Co., 382 F.Supp. 1342 (E.D.Va.1974); May Department Stores Co. v. Prince, 200 U.S.P.Q. 803 (Trademark Trial & Appeal Board 1978). Thus, if Natural had established its common law rights in footwear by at least the beginning of 1976 in the three local markets, Natural's subsequent sale of clothing under the ROOTS mark in those areas might be protected as well. Natural's sales of clothing began in 1979, although it is not clear whether such sales were made in all three metropolitan areas.
 
 
 99
 Even with this understanding of the common law priorities, we are unable to resolve finally the parties' relative rights to the trademark on clothing because the record is insufficient in two respects: (1) Roots' sales activities in the respective markets for 1975 were not presented, so that we cannot determine whether Roots had any common law rights in these areas before Natural's original entry into the markets; and (2) the record does not indicate whether clothing was sold in either the Philadelphia or Pittsburgh markets by Natural under the ROOTS trademark. We therefore are unable to adjudicate properly the common law priorities in the different areas.[62]
 
 
 100
 The other major reason why we conclude that it is necessary to remand the case to the district court is that we do not have sufficient evidence to evaluate the scope of injunctive relief. We would be very hesitant to declare that either party has an exclusive common law right to the ROOTS trademark on clothing throughout either Pennsylvania or New York or any discrete portion(s) thereof. When the district court determines on remand that either Natural or Roots holds the prior right to the trademark in a given area, the court will have to determine with as much specificity as possible the scope of protection to be accorded under an injunction. In deciding on relief, the burden should be on the party with prior rights to prove the scope of its protected market.[63]
 
 D. Conclusion
 
 101
 In sum, we have concluded that the nationwide injunction entered in favor of Roots must be vacated because it is totally without support in the record under the appropriate legal standards. We have also determined that Natural is entitled to substantial injunctive relief outside of New Jersey to protect its federal trademark right in the use of ROOTS on footwear. The rights of the parties to use the ROOTS trademark on clothing and other apparel outside of New Jersey, however, is a question that cannot be resolved based on the present record. The district court will have to consider this specific question on remand.
 
 IV. THE ACCOUNTING FOR PROFITS
 
 102
 Natural challenges the district court's decision to award "an accounting for the profits of Natural derived from the sale of goods in the United States under the mark 'ROOTS.' " Appendix at 943a. Roots argued that the relief was appropriate because Natural had earned profits at Roots' expense by, in effect, palming off its goods under the name of a prominent and respected clothier.
 
 
 103
 In view of our conclusion that Roots has proved no trademark rights outside of New Jersey, the district court's order requiring Natural to render an accounting of its profits will be vacated. Since this issue is "inextricably bound" to the issues we have reviewed, we have jurisdiction, notwithstanding the district court's failure to fix the amount of the award. Kershner v. Mazurkiewicz, 670 F.2d 440, 449 (3d Cir.1982) (in banc).
 
 
 104
 The portion of the accounting order that relates to New Jersey stands on a different ground, because it is not inextricably bound to the issues on review. Natural has conceded in this appeal that Roots has the right of a common law trademark holder in New Jersey, see supra note 32, and the propriety of an accounting depends upon whether Natural's use was in good faith and whether it was palming off in New Jersey,[64] issues we have not considered. Thus, we have no appellate jurisdiction as to that portion of the accounting order and thus express no view as to whether the district court was correct in ordering Natural to account to Roots for profits earned from sales in New Jersey.[65] We note in passing, however, that there was an absence of specific findings on these subjects.
 
 V. ATTORNEYS FEES
 
 105
 Roots appeals from the portion of the district court order denying its request for an award of attorneys fees pursuant to 15 U.S.C. Sec. 1117. Roots contends that the district court was in error when it denied the award of fees on the ground that the "authority of Sec. 1117 extends only to a case where the infringed mark is registered." Appendix at 941a.
 
 
 106
 We conclude that there is no need to address this issue. The Lanham Act states that, "[t]he court in exceptional cases may award reasonable attorneys' fees to the prevailing party." 15 U.S.C. Sec. 1117 (1982) (emphasis added). Given our disposition of the various issues raised in this appeal, we hold that Roots is not a prevailing party in this litigation and is not eligible for attorneys fees.
 
 VI. CONCLUSION
 
 107
 In sum: (1) the nationwide, permanent injunction prohibiting Natural's use of the ROOTS mark will be vacated as to all states except New Jersey; (2) the decision to direct the PTO to cancel the registrations of the ROOTS mark will be reversed and reinstatement of the registrations will be ordered; (3) the decision to order an accounting by Natural of profits will be reversed as to profits earned in all states except New Jersey;[66] and (4) the decision denying an award of attorneys' fees to Roots will be affirmed. We will also dismiss the appeal of the decision to order an accounting by Natural of profits earned in New Jersey.
 
 
 108
 Finally, we will remand the case to the district court for further proceedings in accordance with this opinion so that an appropriate injunction may be entered to protect Natural's federally registered ROOTS trademark on footwear, and so that the district court may consider the common law trademark rights of the parties to the use of the ROOTS trademark on clothing and other apparel.
 
 
 109
 Costs will be taxed against Roots.
 
 
 
 *
 Honorable John P. Fullam, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 All of the facts recited are not disputed, unless otherwise stated
 
 
 [2]
 The agreement between Hart, Schaffner and Marx, Inc. (HSM), and Roots included a provision requiring HSM to pay Roots one percent of the profits from any new store using the ROOTS name within a 50-mile radius of the Summit store
 
 
 [3]
 The separate shoe store closed in 1983, and its merchandise was moved to the Summit store, so that now there are four
 
 
 [4]
 Ads in the New Jersey Monthly and the New Yorker, see infra. invited requests for the Roots catalogue
 
 
 [5]
 Roots has represented that a number of its customers were executives of large national corporations, many of which are headquartered in northern New Jersey, who have been transferred elsewhere in the country. The prominence of Floridians on the list would also suggest that a number of Roots customers have remained on its mailing list after retirement
 
 
 [6]
 The 1979 catalogue generated orders from customers in 25 states and the District of Columbia. Roots produced representative mail order forms, but no tabulation of the amounts of these sales. "Out of state shipments" were made to 31 states in 1977, 45 states in 1978, 44 states in 1979, and 44 states in 1980. Roots produced representative packing slips, but no tabulation of the dollar value of these sales. It is not clear whether these shipments were in response to mail orders or whether walk-in customers had them sent to out-of-state addresses
 
 
 [7]
 Prior to that time, Roots had only maintained credit files for its customers
 
 
 [8]
 The Rolodex contained only one card each for several states including Arkansas, Idaho, Mississippi, Montana, Nebraska, West Virginia, and South Dakota
 
 
 [9]
 For the period November 26 to December 23, 1983, only receipts from customers whose names began with the letters "D" through "S" exist. All other receipts from prior to 1976 were destroyed by Roots in 1980, see infra note 11. The available receipts were analyzed by an accountant retained by Natural
 
 
 [10]
 Roots opened its store at Riverside Mall in 1977
 
 
 [11]
 A large quantity of Roots' sales records were destroyed sometime in 1978 or 1979, even though the dispute, between the parties had begun at least by 1977 when Roots filed an action to cancel Natural's trademark registration. See infra part II. Natural does not contend that the destruction was deliberate, and it did not ask the district court to draw an adverse inference. However, to the extent that Roots is unable to make out a case because of the destruction of these records, it must suffer the consequences of its own actions. At all events, Roots did not attempt to tabulate the exact volume of out-of-state sales
 
 
 [12]
 The record does not concentrate on any earlier period, since it was not until the 1950s that Roots made an effort to upgrade its reputation
 
 
 [13]
 In many of these ads, up until the early 1970s, the ROOTS name appears as the possessive form of the surname Root. This is also true of the New Yorker ads, with the exception of the single ad which appeared in 1977. The apostrophe was dropped in 1968. Beginning in 1967, the local ads feature the "mirrored R" symbol, two 'R's back-to-back bearing a crown. This symbol appears in the New Yorker ads and on Roots brochures and credit cards
 
 
 [14]
 The district court took judicial notice of the fact that the New York Times did not publish a New Jersey edition until that year, when the Newark Evening News, a paper in which Roots had previously advertised, ceased publication
 
 
 [15]
 Each New Yorker ad from the period covered one-sixth of a page and displayed some article of merchandise over the name Root's, the store location and the phrase "Clothiers to gentlemen and their sons." Mail orders were solicited in fine print at the top of the ad
 
 
 [16]
 Prior to applying for registration, Natural hired an attorney to determine whether the mark was already in use. In its list of facts not in dispute, the district court stated that Natural learned of the use of the mark by Roots, "at least as early as" 1977, when Roots filed a cancellation petition
 
 
 [17]
 A beaver in a semi-circle was chosen to symbolize Natural's product and provide it with a Canadian identity
 
 
 [18]
 Because the registration of the mark was accomplished in 1974 and Roots initially filed a petition to cancel the registration with the United States Patent and Trademark Office ("PTO") in 1977, see infra note 25, the incontestability provision of the Lanham Act, which requires as a threshold matter that a trademark be uncontested for a period of five years, is not even arguably applicable. See 15 U.S.C. Sec. 1065
 
 
 [19]
 In 1973, Budman and Green formed Century Importers through which all goods were shipped to Detroit
 
 
 [20]
 Natural's stores were either franchise stores or company stores owned by Budman and Green
 
 
 [21]
 In 1975 Natural also opened 10 new stores throughout Canada, one store in Germany, and one in the Netherlands
 
 
 [22]
 The newspapers were the New York Times, Atlanta Constitution, Village Voice, White Plains Reporter Dispatch, and New York Post; periodicals included People, National Lampoon, Cosmopolitan, New York Times Magazine, Popular Photography, Stereo Review, Tennis, Backpacker, Skiing, and Runner's World
 
 
 [23]
 Ten company stores in Arkansas, Alabama, California, Georgia, Massachusetts, New York, and Pennsylvania also spent $55,667 on advertising in 1975
 
 
 [24]
 Magazines in which Natural advertised included Gentleman's Quarterly, Esquire, The New Yorker, and Interview. Newspapers included the San Francisco Chronicle, the Dallas Times, the New York Times, Chicago Tribune, and Detroit Free Press. Natural also advertised in the trade journal, Footwear News. The franchise stores continued to spend five percent of their annual sales volume on advertising. Company stores in 15 states spent approximately $70,000 on advertising in 1976; company stores in 12 states spent an additional $36,000 in 1977
 
 
 [25]
 This litigation was foreshadowed by Roots' filing of a petition for cancellation of Natural's trademark registrations in the PTO on June 2, 1977. Upon consent of the parties, the cancellation proceeding was ordered suspended by the PTO pending the outcome of the present civil action
 
 
 [26]
 The district court concluded that the trademarks are confusingly similar and that confusion in the marketplace is likely to result if both parties are permitted unrestricted use of the ROOTS mark. See Appendix at 939a. Neither side disputes this finding on appeal
 
 
 [27]
 The discussion of the scope of rights flowing from federal registration must not be read to apply as well to common law rights in a trademark. These latter rights are based on the actual use of a product in an area and, as we discuss infra, are not necessarily limited to the product originally identified by the trademark. Rather, protection from the date of the first use of the mark may extend to related products that are later sold under the common law mark
 
 
 [28]
 The doctrine of incontestability is discussed supra at note 18
 
 
 [29]
 The Second Circuit's holding relied wholly on the language of the Act, see Avon Shoe Co., 279 F.2d at 613 n. 7. We believe, however, that its ruling is animated as well by the policy we discuss in text
 
 
 [30]
 See Standard Brands, Inc. v. Smidler, 151 F.2d 34, 38 (2d Cir.1945) (Frank, J., concurring) ("I use the word 'monopoly' advisedly, because basic in the consideration of cases like this is the fact that judicial protection of any trade name necessarily involves a legalized monopoly....")
 
 
 [31]
 As we discuss later, Natural's trademark rights in accessories and clothing must be considered under the common law. See also supra note 27
 
 
 [32]
 Natural does not, however, challenge the right of Roots to use the ROOTS mark in New Jersey on footwear and clothing
 
 
 [33]
 Weiner King involved, as does this case, the question whether a party is entitled to use the defense under Sec. 1115(b)(5) because it has senior rights in a given area to a trademark that has been registered by another user. Sweetarts, in contrast, involved the question of priority between two common law trademarks. We conclude that the Sweetarts factors are equally relevant when determining the defense to federal registration based upon prior use of the federally registered trademark in a specific geographic area. We therefore find its discussion to be useful in fashioning a test of market penetration that will apply in cases that involve either common law or federally registered trademarks
 
 
 [34]
 In the instant case, we consider Roots' market penetration on a state-by-state basis. We do not take this approach because we subscribe to Justice Holmes' theory of trademark appropriation announced in his concurring opinion in Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 426, 36 S.Ct. 357, 365, 60 L.Ed. 713 (1916) (Holmes, J., concurring). We have already rejected the Holmes' theory of the territorial scope of a trademark. See Jacobs v. Iodent Chemical Co., 41 F.2d 637, 639-40 (3d Cir.1930)
 Our methodology in this case is also not reflective of our view that the area defined by state borders is most appropriate for evaluating the market penetration of the specific product. Thus, this case is unlike Wrist-Rocket Mfg. Co. v. Saunders Archery Co., 578 F.2d 727, 732 (8th Cir.1978), in which the court concluded that state borders defined the market area for a special sling shot "[b]ecause of the nature of the product and the channels of distribution utilized."
 We are, rather, compelled to consider Roots' market penetration within the states, because the only evidence presented at trial is categorized according to the state responsible for the sales. Under optimal conditions, we would scrutinize the product's market penetration on the basis of natural trading areas that may or may not be coextensive with a state's borders. In fact, for most products, including traditional wearing apparel and footwear, the relevant geographic market will comprise only a relatively small portion of a state (e.g., the Pittsburgh area) or of several states (e.g., the Delaware Valley area). Unfortunately the evidence precludes any opportunity to conduct this more meaningful market analysis.
 
 
 [35]
 Consideration of the volume of sales in a given area must, of course, account for the general cost of the trademarked product. Sales of $10,000 in a given area are likely to represent more significant market penetration in that area if the product is candy, than if the product is an automobile
 
 
 [36]
 An analysis of positive growth trends will account for any expansion planned within the subject area for the relevant time period
 
 
 [37]
 The court's only mention of a dollar volume of sales for a specific area occurred in its statement that "sales to New York addresses more than tripled from $36,000. in 1976 to $118,000. in 1977." Appendix at 936a. We note that even these figures, although relevant in construing Roots' market penetration, are for a time period after which Natural had already registered and are, in fact, reasonably attributable to Roots' post-1973 opening of its store at Riverside Square in Hackensack, just across the river from New York City
 
 
 [38]
 The district court did not consider whether sales had declined in any states or whether some states had had no business activity or de minimis activity for significant periods of time. See Sweetarts, 380 F.2d at 929
 
 
 [39]
 At least one treatise writer agrees with this assessment of the importance of advertising. See 2 J.T. McCarthy, Trademarks and Unfair Competition Sec. 26:6, at 213-14 (1973)
 
 
 [40]
 The determination of market penetration in this case is complicated because virtually all of the relevant Roots' sales data dating from the time that Natural registered its mark have been destroyed. The only records remaining from the 1973 time period relate, as we discussed in the facts, to two months of the 1973 holiday season. Even these records, however, are woefully incomplete
 The lack of evidence makes a full analysis of Roots' market penetration particularly difficult because Roots opened a store very close to the New York market after 1973. See supra note 37. As Roots has the burden of proof on this issue, its failure to present probative evidence makes a decision in its favor less likely.
 
 
 [41]
 The district court apparently credited fully this summary of Roots' records, as the court relied on the summary in arriving at its conclusions of law. See Appendix at 936a
 
 
 [42]
 We define states, for purposes of this opinion, to include the District of Columbia and the U.S. Virgin Islands
 
 
 [43]
 These years were calendar years 1976, 1977, and 1979. The records, therefore, are from years later than 1973-1974, the time period for which Roots' trademark rights are to be determined. See supra at 1399. Considering that the sales figures reflect inflation in the price of goods, and 1973-1979 was a period of high inflation, these records in fact are likely to overstate the market penetration of Roots as it stood two to four years earlier
 
 
 [44]
 These records of holiday sales, to the extent that they are complete, reflect a significant portion of the business done over the course of a year. See supra text following note 9
 
 
 [45]
 Based on this approach, Roots also would not be able to prove market penetration in Massachusetts based on Perry Root's statement at trial that Roots planned to open a store in Boston in the near future. Such evidence, although of relevance to the future expansion of Roots in that area, is unrelated to the question whether Roots had achieved sufficient market penetration in Massachusetts at the time Natural registered the trademark. As our preceding discussion indicates, Roots' market penetration in this area was, in fact, de minimis
 
 
 [46]
 Roots' advertising history is detailed supra in part I.A.2
 
 
 [47]
 In light of this conclusion, we need not consider whether Roots has demonstrated secondary meaning for its name
 
 
 [48]
 Roots market records do not distinguish between sales of footwear and sales of clothing. Because its total market penetration outside of New Jersey was inadequate to protect Roots as the senior user at the time of Natural's registration even if all sales had been attributable to footwear, however, Roots failed to meet its burden of proof on its defense against the federal registrant. We therefore need not decide whether, assuming that there was sufficient market penetration with respect to apparel, the common law expansion doctrine, see infra note 61 and accompanying text, would operate on this record to provide Roots with a defense to Natural's federal registration with respect to footwear
 
 
 [49]
 Dr. Assael is a Professor and Chairman of the Marketing Department of New York University. His degrees include an MBA from Wharton/University of Pennsylvania and a Doctorate in Business Administration from Columbia. He authored the text Consumer Behavior in Marketing Action, a leading work utilized by 120 universities and colleges
 
 
 [50]
 Mr. Osterweis, after receiving an MBA from Harvard, was employed by Gimbel Brothers for some 18 years in various capacities ranging from assistant manager of the New York store to chief executive officer of the Pittsburgh Division. He had experience in all aspects of retail store management. Thereafter, he was president and chairman of Associated Merchandising Corporation, a cooperative owned by some 30 retail stores. In 1976, he became the head of the Institute of Merchandising at New York University
 
 
 [51]
 In contrast, to his testimony about Roots, Osterweis also testified that by mid-1976 Natural had acquired a significant reputation for its ROOTS trademark in the major United States markets as evidenced by its sales history and geographic breakdowns, the geographic spread of Natural's company and franchise stores, and the nature, extent and geographic reach of the advertising done by Natural, Century, and the store operations. Mr. Osterweis further testified that Natural had defined for itself a specific market segment, the "comfort" footwear market, and had identified its merchandise with its ROOTS trademark displayed on the shoe boxes, sock linings, and shoe soles, as well as on its non-shoe products
 
 
 [52]
 Natural has not, for example, asserted any rights to its mark under the common law
 
 
 [53]
 The court did state in this regard that Holiday would be able to gain injunctive relief "upon a showing that Holiday actually has begun the development or construction of a motel in the U.S. Virgin Islands." 409 F.2d at 619
 
 
 [54]
 The district court should recognize that the Holiday Inns court was particularly reticent about enjoining the defendant's use in the Virgin Islands because that area is uniquely isolated from other states. Such isolation is not at issue as to the continental United States, and so the injunction in favor of Natural must be extensive enough at least in areas "to which one arrives [not] by ship or plane [but] by turnpike," id. at 618, to protect Natural's rights as a federal registrant of the trademark
 
 
 [55]
 See supra note 33 (explaining that the same general approach to market penetration is used when determining trademark priorities under both the common law and the Lanham Act)
 
 
 [56]
 As we have explained, Roots' rights in relation to Natural's federal trademark rights in the ROOTS trademark were determined as of the time Natural registered. We considered all of the record evidence that was relevant to the extent of Roots' market penetration in arriving at this determination
 
 
 [57]
 To resolve these rights conclusively may require a choice of law inquiry, because common law trademark rights may be protected by both state and federal law. Of this putative choice of law problem in the trademarks context, Judge Clark has commented that "a more academic issue can hardly be conceived," and that resolution of the issue may not make "any difference in ultimate result." Maternally Yours v. Your Maternity Shop, 234 F.2d 538, 545 (2d Cir.1956) (Clark, J., concurring), quoted in 2 J.T. McCarthy, Trademarks and Unfair Competition Sec. 32:13, at 457 (1973). Cf. Campbell Soup Co. v. Armour & Co., 175 F.2d 795, 796 (3d Cir.) (application of rule that "[a] case which involved trademark infringement only, without reference to the [Lanham Act], is governed by state law" is "bewilderingly complicated"), cert. denied, 338 U.S. 847, 70 S.Ct. 88, 94 L.Ed. 518 (1949). But cf. L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., 214 F.2d 649, 651 (3d Cir.1954) (suggesting that the Lanham Act creates a federal tort of false representation of goods in commerce). The parties have neither briefed nor argued this particular question, and we leave it for the district court's resolution in the first instance.Because we do not address specific aspects of state law protection of trademark rights, we will not discuss the doctrine of natural expansion. See generally J.T. McCarthy, supra, Sec. 26:8. This doctrine may affect the determination of common law rights in this case by giving Roots some rights in nearby markets notwithstanding a lack of market penetration in them. Roots' trademark rights may also depend on state law regarding secondary meaning. Finally, state law may have some effect on the specific application of the test of market penetration
 
 
 [58]
 See supra part III.B.2
 
 
 [59]
 A store in White Plains opened in February, a store in Greenwich Village opened in July, and a store in Armonk opened in October
 
 
 [60]
 Such protection would, of course, supplement the rights Natural gained by federal registration of the trademark on footwear
 
 
 [61]
 This rule, which essentially allows the later use of a trademark on a related product to relate back to the first use of the trademark, is significantly different from the rule defining the scope of protection resulting from registration of a federal trademark. See supra part III.B.2. This difference is reasonably attributed to the fact that common law rights may only be gained through use of a specific trademark in a specific area, while federal trademark protection is based in part on the constructive notice function of the terms of the federal registration
 
 
 [62]
 These priorities may also be affected by the doctrines of natural expansion and secondary meaning. See supra note 57
 
 
 [63]
 This decision about the scope of injunctive relief may also be affected by the decision about which state law applies to the case. This is because a state may have adopted the Holmes' view about the extent of trademark protection, see supra note 34, and injunctive relief covering less than the entire state may not be permissible
 
 
 [64]
 The record indicates that Natural's products were sold in New Jersey under the ROOTS mark in at least one Saks store. See supra at 1393
 
 
 [65]
 Judge Fullam, noting inter alia that we are reviewing a single order, believes that the accounting order covering New Jersey is inextricably bound to our review of the nationwide injunction. He would therefore hold that we also have jurisdiction over that portion of the accounting order and would vacate it and remand for further proceedings so as to determine whether Natural should be required to render an accounting of its sales in New Jersey. Judge Fullam notes that the validity of such a limited accounting order would depend upon whether Natural's use of its mark in New Jersey occurred in good faith, and whether Natural was palming off its products in New Jersey and observes that the absence of specific findings on these subjects precludes meaningful appellate review at this juncture
 
 
 [66]
 We do not approve the accounting as to New Jersey. We simply hold that we have no jurisdiction to review the question