Windsor Jewelers, Inc. v. Windsor Fine Jewelers, LLC, 2009 NCBC 2.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
08 CVS 24643

WINDSOR JEWELERS, INC.,

        Plaintiff,

        v.

WINDSOR FINE JEWELERS, LLC;
WINDSOR JEWELERS, LLC; and
ALPINE INVESTORS, LP,

        Defendants.

**ORDER & OPINION**

*Shumaker, Loop & Kendrick, LLP by Eric A. Rogers, Joseph J. Santaniello, and Dawn Barker Floyd for Plaintiff.*

*Moore & Van Allen, PLLC by Anthony T. Lathrop and J. Mark Wilson for Defendants.*

Diaz, Judge.

{1}    Before the Court is Plaintiff's Motion for Preliminary Injunction pursuant to Rule 65 of the North Carolina Rules of Civil Procedure ("the Motion").

{2}    Following an expedited hearing in chambers on 14 November 2008, the Court granted Plaintiff's request for a Temporary Restraining Order ("TRO"), which maintained the status quo and allowed the parties to develop the record on the Motion.

{3}    After considering the Court file, the Motion, the briefs of the parties, the evidence of record, and the arguments of counsel, the Court **DENIES** Plaintiff's Motion and dissolves the TRO entered on 20 November 2008.

I.

PROCEDURAL BACKGROUND

{4}    On 5 November 2008, Plaintiff filed its Complaint in Mecklenburg County Superior Court, asserting claims for fraud and unfair and deceptive trade practices

and seeking a TRO pursuant to Rule 65(b) of the North Carolina Rules of Civil Procedure.

{5}     On 12 November 2008, this case was designated as a mandatory complex business case and assigned to me.

{6}     On 13 November 2008, Plaintiff filed its brief in support of its Motion for a TRO (the "TRO Motion").

{7}     On 14 November 2008, Defendants filed their response brief in opposition to the TRO Motion.

{8}     Also on 14 November 2008, the Court heard oral argument in chambers on the TRO Motion.

{9}     The Court issued a TRO on 20 November 2008.

{10}    The TRO restrained Defendants from "using the name, marks, or terms *Windsor Fine Jewelers,* including any and all variants, in Charlotte, North Carolina in conjunction with the 'Lions Jewelers' stores' and required Defendants to gather up and destroy "all existing inventory of advertising, brochures, catalogs, apparel or other indicia, whether in electronic format or physical format, and including all broadcast media, that bear or include the terms *Windsor Fine Jewelers* for use in conjunction with the 'Lions Jewelers' stores[.]"  (TRO 2.)[1]

{11}    On 4 December 2008, Plaintiff filed the Motion without an accompanying brief.

{12}    Defendants filed a brief in opposition to the Motion on 17 December 2008.

{13}    Also on 17 December 2008, Plaintiff filed a reply brief in support of the Motion.

{14}    The Court heard oral argument on the Motion on 19 December 2008.

---

[1] By consent of the parties, the TRO has been extended pending a ruling by the Court on the Motion.

## II.

## THE FACTS

### A.

### THE PARTIES

{15} Plaintiff Windsor Jewelers, Inc. ("Windsor") is a North Carolina corporation with its place of business in Winston-Salem, North Carolina. (Compl. ¶ 1.)

{16} Defendant Windsor Fine Jewelers, LLC ("Windsor Fine") became a North Carolina limited liability company on or about 2 June 2008. (Thompson Aff., Ex. 11.)

{17} Defendant Windsor Jewelers, LLC ("Windsor Georgia") is a Georgia entity with its principal place of business in Augusta, Georgia. (Compl. ¶ 5.)

{18} Defendant Alpine Investors, LP ("Alpine") is a Delaware entity with its principal place of business in San Francisco, California. (Compl. ¶ 6.)

{19} Alpine owns Windsor Georgia. (Compl. ¶ 7.)

{20} Alpine and Windsor Georgia own Windsor Fine. (Compl. ¶ 8.)

### B.

### THE CLAIMS

### 1.

### PLAINTIFF'S MARK

{21} Plaintiff's registered mark is for "Windsor Jewelers." (Pl's. Compl., Ex. A.) Specifically, the registered mark is described as follows:

> "Windsor Jewelers" in a stylized font and printed inside a diamond. The word "Windsor" is printed on top of the word "Jewelers" with bold lines directly above and below the word "Windsor." With the exception of those areas of the diamond where the literal elements intersect the shape, the diamond is filled with horizontal lines. (Disclaims exclusive use of the word "Jewelers" apart from the mark as a whole.[)]

(Pl's. Compl., Ex. A.)

{22}   Plaintiff first registered its service mark pursuant to the North Carolina Trademark Registration Act (the "NCTRA"), N.C. Gen. Stat. §§ 80-1 through 80-14 (2007), in the 1980s.  (Pl's. TRO Br. 1.)[2]

{23}   On 22 October 2004, Plaintiff renewed its service mark with the North Carolina Secretary of State.  (Compl. ¶ 19; Pl's. TRO Br. 1.)

2.

PLAINTIFF'S SALES IN RELATION
TO THE MARKET

{24}   Plaintiff operates a single retail jewelry store in Winston-Salem, North Carolina (Compl. ¶ 3.)

{25}   Over the past fifteen (15) years, Plaintiff has sold more than $4.825 million worth of merchandise within a fifty (50) mile radius outside of Cornelius, North Carolina.  (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot., Ex. 7, at ¶ 11.C (hereinafter "Sarah Simon Affidavit").)[3]

{26}   During this period, however, Plaintiff has averaged annual sales of $66,024 in Mecklenburg County.  (Defs'. Opp. Pl's. Mot. Prelim. Inj., Ex. A, at 6 tbl.10 (hereinafter "Connaughton Affidavit & Report").)

{27}   In 1997, specialty jewelry stores[4] in Mecklenburg County sold $73,568,703 worth of merchandise.  (Connaughton Affidavit & Report 4 tbl.5.)  In 2002 and 2006, those figures were $107,274,325 and $138,578,260, respectively.  (Connaughton Affidavit & Report 4 tbl.5.)

---

[2] The NCTRA defines a "trademark" as "any word, name, symbol, or device or any combination thereof adopted and used by a person to identify goods made, sold, or distributed by him and to distinguish them from goods made, sold, or distributed by others."  N.C. Gen. Stat. § 80-1(f) (2007).  At issue in this case is a "service mark," which identifies and distinguishes the source of a service rather than a product.  N.C. Gen. Stat. § 80-1(e) (2007).

[3] The Court takes judicial notice of the following facts:  (1) that Charlotte and Cornelius are cities in Mecklenburg County; (2) that these cities are within twenty (20) miles of each other; and (3) that a fifty (50)-mile radius outside of the city of Cornelius extends beyond the borders of Mecklenburg County.

[4] "Specialty jewelry stores" do not include "general retailers" who also sell jewelry, such as Wal-Mart, J.C. Penney, Macy's, Nordstrom, and Saks.  (Connaughton Affidavit & Report 1.)  In 2006, Mecklenburg County had one hundred (100) specialty jewelry stores and a population of 835,328. (Connaughton Affidavit & Report 4 & tbl.6.)

{28} In 1997, 2002, and 2006, Plaintiff's annual sales in Mecklenburg County were $57,893, $37,973, and $112,516, respectively. (Connaughton Affidavit & Report 6 tbl.10.)

### 3.

### THE DISPUTE

{29} In December 2006, Defendants acquired three retail stores in the Charlotte area that were doing business as "Lions Jewelers" at the time of the acquisition. (Compl. ¶ 20; Pl's. TRO Br. 3.)

{30} Prior to Defendants' acquisition of the Lions Jewelers stores, Donald Thompson ("Thompson"), Member and Manager of Windsor Georgia, approached Plaintiff regarding a potential sale or merger. (Compl. ¶ 21; Pl's. TRO Br. 3.)

{31} Thompson told Plaintiff that Defendants wanted to expand their retail jewelry business into North Carolina and that they wanted to use the "Windsor" name in North Carolina. (Compl. ¶ 21; Pl's. TRO Br. 3.)

{32} In or around December 2006, Alpine approached Plaintiff on behalf of all Defendants to discuss the possibility of Plaintiff selling its business to, or merging with, Defendants. (Compl. ¶ 22; Pl's. TRO Br. 3.)

{33} As part of these discussions, Defendants told Plaintiff that it would be a conflict to expand into North Carolina using the "Windsor" name without either acquiring Plaintiff or obtaining Plaintiff's permission to do so. (Compl. ¶ 23; Pl's. TRO Br. 3.)

{34} On or about 9 February 2007, Alpine offered to purchase Plaintiff for $4.9 million, of which $500,000 was intended to compensate Plaintiff "for all rights to the Windsor Jewelers name currently owned by [Plaintiff]." (Compl., Ex. E; Compl. ¶ 25; Pl's. TRO Br. 3–4.)

{35} Plaintiff rejected Alpine's offer and instead offered to sell only the "Windsor Jewelers" name to Alpine for $750,000. (Compl. ¶¶ 27–28; Pl's TRO Br. 4.)

{36} Thereafter, Defendants informed Plaintiff they planned to operate their recently acquired Charlotte retail stores under the "Lions Jewelers" name and that

Windsor Georgia also planned to operate under the "Lions Jewelers" name. (Compl. ¶¶ 28–29; Pl's. TRO Br. 4.)

{37} On or about 7 August 2008, Plaintiff became aware that Defendants intended to operate the Lions Jewelers stores in Charlotte under the name "Windsor Fine Jewelers." (Compl. ¶ 32; Pl's. TRO Br. 4.)

{38} On that same date, Plaintiff demanded in writing that Defendants stop using the "Windsor Fine Jewelers" name in connection with its North Carolina retail stores. (Compl. ¶ 32; Compl., Ex. F; Pl's. TRO Br. 4.)

{39} On 16 October 2008, Plaintiff wrote Windsor Fine's counsel requesting that the status quo be maintained in lieu of requesting a TRO. (Compl. ¶ 33; Pl's. TRO Br. 4.) Plaintiff also requested that Windsor Fine and Windsor Georgia not advertise in North Carolina using the name "Windsor Jewelers" or "Windsor Fine Jewelers." (Compl. ¶ 33; Compl., Ex. G; Pl's. TRO Br. 4.)

{40} Despite Plaintiff's request, Defendants have advertised in North Carolina as "Lions Jewelers soon to be Windsor Fine Jewelers." (Compl. ¶ 34; Pl's. TRO Br. 5; Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot., Ex. 17, at WGA0048, WGA0050.)

{41} The font and style of the words "Windsor" and "Jewelers," as used by Defendants, are similar to those used by Plaintiffs. (Compl. ¶ 34; Pl's. TRO Br. 5.)

{42} Plaintiff, Windsor Fine, and Windsor Georgia are engaged in the same business and focus principally on the same or similar market sector and demographics within the jewelry trade. (Compl. ¶ 35.)

{43} Plaintiff, Windsor Fine, and Windsor Georgia carry at least twelve (12) of the same exclusive brands of jewelry in their stores. (Compl. ¶ 35.)

III.

CONTENTIONS OF THE PARTIES

{44} Plaintiff alleges that Defendants committed an unfair and deceptive trade practice by misappropriating Plaintiff's service mark in connection with the sale of jewelry in Charlotte, North Carolina.

{45} Plaintiff also asserts that Defendants committed common law fraud by falsely representing that they intended to make a good faith offer to purchase Plaintiff's business, which in turn induced Plaintiff to reveal its confidential business information to Defendants during negotiations. (Compl. ¶¶ 37–48.)

{46} Plaintiff contends it is entitled to a preliminary injunction because it has demonstrated a reasonable likelihood that it will prevail on the merits of its service mark infringement claim. (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot. 1.)

{47} According to Plaintiff: (1) its service mark is registered with the North Carolina Secretary of State pursuant to the NCTRA; and (2) it also has common law rights to the exclusive use of its mark. (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot. 1.)

{48} Plaintiff contends its mark has penetrated the Charlotte market so as to warrant injunctive relief and that Defendants' use of a similar mark in the same market is likely to cause confusion. (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot. 4.)

{49} With respect to likelihood of confusion between the competing marks, Plaintiff contends the strength or distinctiveness of its mark is shown by the fact that it spends approximately $750,000 per year on marketing and advertising to highlight Windsor "as the place to go for high end [jewelry] merchandise." (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot. 6.)

{50} Plaintiff further contends that Defendants' mark is sufficiently similar in appearance to Plaintiff's mark in that "the dominant portion of both marks is the word 'Windsor,'" and "[t]he advertising used by both parties places the word 'Windsor' in larger letters than those of any other words and place [sic] the word 'Windsor' above all other words, thus reinforcing the dominance of the mark 'Windsor.'" (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot. 7.)

{51} Plaintiff also contends that "[t]he parties trade in similar goods, use similar facilities to trade their goods, and use similar advertising." (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot. 9.)

{52} Further, Plaintiff alleges that Defendants actually intend "'to confuse the buying public'" (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot. 9 (*quoting Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984))), citing: (1) the cease and desist letter Plaintiff sent Defendants; (2) Thompson's purported insincerity at his 30(b)(6) deposition regarding Defendants' misappropriation of Plaintiff's service mark; and (3) the history between the parties generally. (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot. 7–9.)

{53} With respect to irreparable harm, Plaintiff contends, first, that irreparable harm should be presumed by the Court where, as here, there is a likelihood of confusion among consumers, and, second, that Plaintiff has demonstrated actual irreparable harm, including the loss of goodwill and the potentially permanent loss of customers to Defendants, who are competitors. (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot. 10–11.)

{54} Defendants, on the other hand, proffer three reasons why Plaintiff is not entitled to preliminary injunctive relief. (Defs'. Opp. Pl's. Mot. Prelim. Inj. 1.)

{55} First, Defendants contend the evidence is insufficient to support Plaintiff's claim to an exclusive right to use the "Windsor" name in connection with the sale of jewelry in Charlotte. (Defs'. Opp. Pl's. Mot. Prelim. Inj. 1.)

{56} Specifically, Defendants allege Plaintiff has not penetrated the Charlotte jewelry market and that Charlotte is not within Plaintiff's zone of natural expansion. (Defs'. Opp. Pl's. Mot. Prelim. Inj. 1.)

{57} Second, Defendants contend Plaintiff has not demonstrated a likelihood of confusion among consumers in the Charlotte market. (Defs'. Opp. Pl's. Mot. Prelim. Inj. 1.)

{58} Third, Defendants contend Plaintiff's state trademark registration is subject to cancellation because another entity began using a similar "Windsor" mark in connection with a retail jewelry store before Plaintiff ever used its registered mark. (Defs'. Opp. Pl's. Mot. Prelim. Inj. 2.)

# IV.

## PRINCIPLES OF LAW

### A.

### PRELIMINARY INJUNCTION STANDARD

{59}   A preliminary injunction

> "is an extraordinary measure taken by a court to preserve the status quo of the parties during litigation. It will be issued only (1) if a plaintiff is able to show *likelihood* of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation."

*A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759–60 (1983) (*quoting Ridge Cmty. Investors, Inc. v. Berry*, 293 N.C. 688, 701, 239 S.E.2d 566, 574 (1977)) (citations omitted).

{60}   Before a preliminary injunction may issue, a plaintiff must post a bond in an amount the Court determines "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  N.C. R. Civ. P. 65(c) (2007).

### B.

### TRADEMARK INFRINGEMENT

{61}   Section 80-2 of the North Carolina General Statutes governs the "registrability" of a trademark in North Carolina.  Among other limitations,

> *[a] mark* by which the goods or services of any applicant for registration may be distinguished from the goods or services of others *shall not be registered if it . . . [c]onsists of or comprises a mark which so resembles a mark registered in this State* or a mark or trade name previously used in this State by another and not abandoned, *as to be likely*, when applied to the goods or services of the applicant, *to cause confusion or mistake or to deceive.*

N.C. Gen. Stat. § 80-2(6) (2007) (emphasis added).

{62} The unauthorized use of a mark registered under the NCTRA also constitutes a violation of the North Carolina Unfair and Deceptive Trade Practices Act. *See* N.C. Gen. Stat. §§ 80-11, 80-12 (2007).[5]

{63} The purpose of the NCTRA "is to provide a system of State trademark registration and protection substantially consistent with the federal system of trademark registration and protection under the Trademark Act of 1946, 15 U.S.C. § 1051, et seq., as amended."[6] N.C. Gen. Stat. § 80-1.1 (2007). As such, "[t]he construction given the federal act should be examined as persuasive authority for interpreting and construing [the NCTRA]." *Id.*

{64} In order to prevail in an action for trademark infringement under the Lanham Act, a plaintiff must establish two elements: (1) "that it has a valid, protectible trademark"; and (2) "that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995) (*citing* 15 U.S.C. § 1114(1)); *see also* N.C. Gen. Stat. § 80-11(1) (2007) ("[A]ny person who shall . . . [u]se in this State without the consent of the registrant, any. . . colorable imitation of a mark registered under this Article in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services . . . shall be liable to a civil action by the owner of such registered mark . . . .").

{65} As to the first element, a trademark is "protectible" only if the holder of the mark has used (or is likely to use) its mark in the same geographic area in which it seeks to enjoin the junior user. *See Lone Star*, 43 F.3d at 931–32.

{66} Federal registration under the Lanham Act provides a trademark owner with a presumption of nationwide priority as a senior user. *See, e.g., Armand's Subway, Inc. v. Doctor's Assocs., Inc.*, 604 F.2d 849, 849–50 (4th Cir. 1979).

---

[5] The NCTRA is not intended to "adversely affect the rights or the enforcement of rights in marks acquired in good faith at any time at common law." N.C. Gen. Stat. § 80-13 (2007).

[6] The federal Trademark Act of 1946, 15 U.S.C. §§ 1051–1141n, will be referred to herein as the "Lanham Act."

{67}   The senior user, however, has no right to injunctive relief against a junior user unless the senior user has used its mark, or is likely to use its mark, in the same geographic area in which it seeks to enjoin the junior user. *See Lone Star*, 43 F.3d at 931–32 ("Under the Lanham Act, the senior owner of a federal registration has superior priority over all junior users, but a court will enjoin the junior user only if the registrant is likely to enter, or has entered, the junior user's trade territory.").

{68}   Similarly, a senior user asserting common law trademark rights generally may protect its trademark against a junior user only in areas where it has actually used its mark. *See Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 416 (1916) (describing the pre-Lanham Act law), *superseded by statute*, Lanham Act, 15 U.S.C. §§ 1051–1141n, *as recognized in Park 'n Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189 (1985).[7]

{69}   The cases interpreting the Lanham Act rely on one of two tests to determine whether a senior user has a "market presence" in a given area: (1) the "market penetration" test, which applies where the senior user actually uses its mark in the market in which it seeks an injunction; or (2) the "zone of natural expansion" test, which applies where the senior user has not actually penetrated the market, but may be likely to do so. *See, e.g.*, *Spartan Food Sys., Inc. v. HFS Corp.*, 813 F.2d 1279, 1283 (4th Cir. 1987).

{70}   Under the "market penetration" test, courts determine use in an area by considering the following factors: "'(1) the volume of sales of the trademarked product; (2) the growth trends in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the

---

[7] North Carolina's common law is no different, *see Blackwell's Durham Tobacco Co. v. Am. Tobacco Co.*, 145 N.C. 367, 374, 59 S.E.123, 126 (1907) ("A trade-mark can be acquired only by actual use[] of the mark in the market. A mere intent to use particular terms or marks as a trade-mark, however clearly manifested, is insufficient in the absence of actual use[]."), and likelihood of confusion, *Charcoal Steak House, Inc. v. Staley*, 263 N.C. 199, 202, 139 S.E.2d 185, 187–88 (1964) (stating that a junior user may use the generic words that have come to be associated with a senior user if the junior user "accompanies their use with something that will adequately show that the [senior user] or his product is not meant").

amount of product advertising in the area.'" *Id.* at 1283 (*quoting Natural Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1398–99 (3rd Cir. 1985)).

{71}   Alternatively, courts consider the following factors to determine a trademark owner's area of use under the "zone of natural expansion" test: "'the party's (1) previous business activity; (2) previous expansion or lack thereof; (3) dominance of contiguous areas; (4) presently-planned expansion; and, where applicable (5) possible market penetration by means of products brought in from other areas.'" *Id.* (*quoting Weiner King, Inc. v. The Wiener King Corp.*, 615 F.2d 512, 523 (C.C.P.A. 1980)).

{72}   If the senior user has a market presence in the relevant market under either test, the court then determines whether the junior user's use of its mark "is likely to cause confusion or mistake or to deceive as to the source of origin of . . . goods or services." N.C. Gen. Stat. § 80-11(1); *see also Pizzeria Uno*, 747 F.2d at 1527 (stating that, under the Lanham Act, "the issue is whether the use of the accused copy or colorable imitation of the registered mark is 'likely to cause confusion, or to cause mistake, or to deceive'" (*quoting* 15 U.S.C. § 1114(1)) (internal quotation marks omitted)).

{73}   To determine whether there exists a likelihood of confusion, courts consider the following factors:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; and (7) actual confusion.

*CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267–68 (4th Cir. 2006) (*citing Pizzeria Uno*, 747 F.2d at 1527).

{74}   If the senior user does not have a market presence in the relevant market, however, it is not entitled to injunctive relief and, therefore, there is no need to determine whether "likelihood of confusion" exists. *See generally Pizzeria Uno,* 747 F.2d at 1536 (denying the plaintiff's request for injunctive relief because the

plaintiff had not penetrated the relevant market even though the court had previously concluded that there was likelihood of confusion between the marks of the plaintiff and the defendant).

V.

ANALYSIS

{75} The Court finds that Plaintiff has a valid service mark that is registered with the Secretary of State of North Carolina. (*See* Compl., Ex. A.)

{76} Plaintiff first began using its mark in the 1980s and most recently renewed it on 22 October 2004. (Compl., Ex. A; Pl's. TRO Br. 1.)

{77} The registered mark is for "'Windsor Jewelers' in a stylized font and printed inside a diamond." (Pl's. Compl., Ex. A.) For a full description of Plaintiff's mark, see *supra* ¶ 21.

{78} Whether this mark is "protectible," however, depends on whether Plaintiff has established "use" of the mark in the same geographic area in which it seeks to enjoin Defendants from using the "Windsor" name. *See Lone Star*, 43 F.3d at 931–32.

{79} In deciding this issue, the Court must first determine the relevant geographic market.

{80} Plaintiff has not specifically defined the relevant market and, in fact, has proffered at least four (4) different definitions.

{81} First, in its brief in support of its request for a TRO, Plaintiff suggested that the market is the entire state of North Carolina. (Pl's. TRO Brief 13–14; *see also* Compl., Prayer for Relief ¶ 1–2.)

{82} In a deposition, however, Plaintiff's president asserted that the "whole band in North Carolina . . . between [Raleigh] and [Charlotte]" is "one large market." (Aff. J. Mark Wilson, Ex. A, at 65:6–66:7 (hereinafter "Robert Simon Dep.").)

{83} In its reply brief in support of its Motion for Preliminary Injunction, on the other hand, Plaintiff contends the relevant market is a 100-mile radius around

either Plaintiff's Winston-Salem store or Defendants' "Lions Jewelers" stores in Charlotte. (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot. 3–4.)

{84} Finally, in an affidavit attached to this same reply brief, Plaintiff suggests the relevant market is a fifty (50)-mile radius around Cornelius, North Carolina and provides sales figures related to this geographic area. (Sarah Simon Affidavit ¶ 11.C.)

{85} Plaintiff's selection of a fifty (50)-mile radius around the city of Cornelius as the relevant market, however, is completely arbitrary, as there is no explanation in the record as to why Ms. Simon chose to define the market in this manner. (*See* Robert Simon Dep. 55:15–20 ("I don't know [why she chose to use Cornelius as the center of the fifty (50)-mile radius in her definition of the Charlotte area]. And I could speculate, but I can't attest to what my wife was thinking.").)

{86} Moreover, Plaintiff's Motion seeks to enjoin Defendants from using the "Windsor" name in Charlotte, North Carolina. As a result, because state registration of a trademark entitles the trademark owner to injunctive relief only in areas of the state where it has established use of its mark, *see Lone Star*, 43 F.3d at 931–32, the relevant market must be the Charlotte area.

{87} In that regard, the Court agrees with Defendants that the relevant market may logically and more broadly be defined as Mecklenburg County. (*See* Defs'. Opp. Pl's. Mot. Prelim. Inj. 4–5 (stating that "the natural trading area for a retail jewelry store located in the city of Charlotte may be broadly defined as Mecklenburg County").)

{88}   The Court concludes Plaintiff does not have a sufficient market presence in the Charlotte market (i.e. in Mecklenburg County) to warrant preliminary injunctive relief, whether analyzed as a function of Plaintiff's "market penetration" or its "zone of natural expansion."[8]

{89}   Generally speaking, "a party should be awarded ownership of a mark in a specific geographic area only when the party's mark has achieved market penetration that is 'significant enough to pose the real likelihood of confusion among the consumers in that area.'" *Natural Footwear*, 760 F.2d at 1397 (*quoting Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 929 (8th Cir. 1967)).

{90}   The first factor under the "market penetration" test—volume of sales— must be evaluated with respect to the product being sold and "must, of course, account for the general cost of the trademarked product." *Natural Footwear*, 760 F.2d at 1399 n.35.  Thus, "[s]ales of $10,000 in a given area are likely to represent more significant market penetration in that area if the product [being sold] is candy, than if the product is an automobile." *Id.*

{91}   With respect to jewelry sales, "a single item [sold by Plaintiff and Defendants] can exceed tens of thousands of dollars." (Defs'. Opp. Pl's. Mot. Prelim. Inj. 10.)  *See* Windsor Jewelers Online Catalog, http://www.windsor-jewelers.com/windsor-jewelers/catalog (last visited Feb. 13, 2009) (follow "7" hyperlink) (indicating that diamond studs are available from $175 to $98,000); Windsor Fine Jewelers Website, http://www.windsorfinejewelers.com/catalog/category/view/price/2,100000/id/54 (last

---

[8] There is a split in the cases as to which party bears the burden of proving market presence in the relevant market.  *Compare Natural Footwear*, 760 F.2d at 1399 (stating that the ultimate burden rested on the purported senior user, who had not registered its mark, but who was relying on common law trademark rights in seeking an injunction against the junior user), *and Accu Pers., Inc. v. AccuStaff, Inc.*, 846 F. Supp. 1191, 1206 n.15 (D. Del. 1994) (stating that "at least for purposes of the market penetration test, the senior user bears the burden of proving the reputation of its trademark extends into a particular area" (*citing Natural Footwear*, 760 F.2d at 1403; *Sweetarts v. Sunline, Inc.*, 436 F.2d 705, 707 (8th Cir. 1971))), *with Four Seasons Hotels Ltd. v. Koury Corp.*, 776 F. Supp. 240, 246 (E.D.N.C. 1991) ("Registration shifts the burden of proof to a would-be-user of the same or similar mark to rebut the presumption of the registrant's exclusive rights in the mark." (*citing Pizzeria Uno*, 747 F.2d at 1529)).  In this case, however, the point is moot, as the Court is satisfied that Defendants have, in fact, rebutted any presumption that attaches to Plaintiff by virtue of its State registration.

visited Feb. 13, 2009) (displaying a Gregg Ruth Platinum Diamond Eternity Necklace, which is priced at $165,000).

{92}   As for the relevant timeframe, the senior user's market penetration should be evaluated as of the time at which the junior user first registered its mark. *Natural Footwear*, 760 F.2d at 1397 (analyzing whether a senior user who had never registered its trademark had nevertheless obtained common law trademark rights superior to the rights of the junior user, which the junior user obtained by means of its federal registration).

{93}   Here, however, Defendant—the junior user—does not have a registered mark in North Carolina.  As a result, the comparable starting date for purposes of this analysis is arguably the summer of 2008, which was the period in which Defendants first attempted to use their mark in Charlotte.  Because Plaintiff and Defendants both analyze sales volume over the past fifteen (15) years, however, the Court will similarly analyze this fifteen (15)-year period.

{94}   As noted earlier, since 1993, Plaintiff has sold approximately $4.825 million of merchandise in a fifty (50)-mile radius around Cornelius, North Carolina. (Sarah Simon Affidavit ¶ 11.C.)

{95}   Although the Court has taken judicial notice that the city of Cornelius is situated within Mecklenburg County, *see supra* note 3, the Court has also noted that Plaintiff's attempt to define the Charlotte market as a fifty (50)-mile radius from the center of Cornelius extends the market well beyond the borders of Mecklenburg County and, thus, has no support as a matter of fact or logic, *see supra* note 3, ¶ 85.

{96}   As a result, Plaintiff's related sales figures are not particularly helpful to the Court's analysis.

{97}   Based on raw sales data obtained in discovery, Defendants assert that over the last fifteen (15) years, Plaintiff has averaged annual sales of $66,024 in Mecklenburg County.  (Connaughton Affidavit & Report 6 tbl.10 (reviewing sales data provided by Plaintiff in discovery).)

{98}    For purposes of comparing Plaintiff's sales volume with that of other specialty jewelry stores in Mecklenburg County, Defendant has provided the Court with estimated sales data of Mecklenburg County jewelry stores for the years 1997, 2002, and 2006.  (*See* Connaughton Affidavit & Report 3, 4 tbl.5.)

{99}    In 1997, specialty jewelry stores in Mecklenburg County sold $73,568,703 worth of jewelry, and in 2002, that figure was $107,274,325.  (Connaughton Affidavit & Report 4 tbl.5.)  In 2006, these stores made $138,578,260 in jewelry sales.  (Connaughton Affidavit & Report 4 tbl.5.)

{100} In 1997, 2002, and 2006, Plaintiff's annual sales in Mecklenburg County were $57,893, $37,973, and $112,516, respectively.  (Connaughton Affidavit & Report 6 tbl.10.)

{101} Stated another way, Plaintiff's sales represented 0.08% of jewelry sales in Mecklenburg County in 1997; 0.04% in 2002; and 0.08% in 2006.

{102} By comparison, each specialty jewelry store in Mecklenburg County represented, on average, approximately 1.0% of total sales in the county during this time period.  (Connaughton Affidavit & Report 5.)

{103} Thus, Plaintiff's volume of sales in Mecklenburg County does not show any significant market penetration as compared to the broader market.[9]

{104} The second factor in the "market penetration" test "focuses upon the product's growth trends in the area" during the relevant time period.  *See Natural Footwear*, 760 F.2d at 1401.

{105} From 1994 to 2008, Plaintiff's sales increased from $11,141 to $67,348, which increase is more than six-fold.  (Connaughton Affidavit & Report 6 tbl.10.)

{106} As can be seen from the table below, however, Plaintiff's annual sales fluctuated significantly during this period:

---

[9] In granting Plaintiff's request for a TRO, the Court determined, based on the limited evidence before it, that Plaintiff's use of its mark in the Charlotte was more than *de minimis.*  Upon further reflection, however, and after reviewing the more expanded record now before it, the Court finds that its earlier conclusion was incorrect.

| Year | Sales |
|------|-------|
| 1994 | $11,141 |
| 1995 | $60,627 |
| 1996 | $129,939 |
| 1997 | $57,398 |
| 1998 | $88,295 |
| 1999 | $106,365 |
| 2000 | $59,578 |
| 2001 | $44,674 |
| 2002 | $37,973 |
| 2003 | $52,045 |
| 2004 | $37,002 |
| 2005 | $57,710 |
| 2006 | $112,516 |
| 2007 | $67,250 |
| 2008 | $67,348 |

(Connaughton Affidavit & Report 6 tbl.10.)

{107} Accordingly, Plaintiff's sales figures during this period do not reveal any discernible growth trends.

{108} The third factor in the "market penetration" test—the number of persons actually purchasing Plaintiff's product in relation to the potential number of customers—suggests strongly that Plaintiff has not penetrated the Charlotte market.

{109} Plaintiff has sold jewelry to approximately 102 different customers from Mecklenburg County over the past fifteen (15) years. (*See* Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot., Ex. 8, at WJI 002381–002407.)[10]

{110} In 2006, Mecklenburg County had one hundred (100) specialty jewelry stores and a population of 835,328, which means that there was one specialty jewelry store for every 8,353.28 residents in Mecklenburg County. (Connaughton Affidavit & Report 4 & tbl.6.)

{111} Thus, even assuming that all 102 of Plaintiff's Mecklenburg County customers purchased goods from Plaintiff in 2006 (as opposed to making their purchases over a fifteen (15)-year period), only 1.2% of its allocated 8,353.28 residents actually purchased Plaintiff's merchandise.

{112} The Court, however, recognizes this calculation is at best marginally relevant, as the parties did not present evidence of the number of Charlotte residents who actually purchase high end jewelry. *Accord Natural Footwear*, 760 F.2d at 1399 ("[A] proper evaluation of market penetration should normally include a comparison of the number of actual consumers of the trademarked product with the number of people in the market for the product, rather than with the full population of a given area."). In other words, only a subset of the 835,328 residents would be part of this high end jewelry market, but neither party has presented evidence identifying that group.

---

[10] This portion of Exhibit 8 is Plaintiff's "Customer Sales Report" from 2 October 1993 through 23 November 2008. The report lists every sale Plaintiff has made during this period in Charlotte and the surrounding areas, as well as other locations, and it lists each customer to whom each sale was made (by customer number). Consistent with Defendants' determination (*see* Defs'. Opp. Pl's Mot. Prelim. Inj. 13), the Court concluded that Plaintiff sold jewelry to 102 different customers from Mecklenburg County during this period by extracting the number of different customers with residences having Mecklenburg County zip codes. Specifically, each of the following cities and zip codes found in the report are within the borders of Mecklenburg County: Cornelius (28031); Davidson (28036); Huntersville (28078); Matthews (28104 & 28105); and Charlotte (all zip codes contained in the report with the exception of 27006, which is not a Charlotte zip code). *See* Melissa Data, ZIP Codes by County, http://www.melissadata.com/Lookups/CountyZip.asp?fips=37119 (last visited Feb. 13, 2009) (listing zip codes within Mecklenburg County). The Court has used the Bates stamp numbers at the bottom of the reports' pages to identify the relevant portion of the report.

{113} As a result, it may be more accurate to analyze this factor by considering the percentage of total jewelry transactions Plaintiff has completed in Mecklenburg County.

{114} In 2006, specialty jewelry stores in Mecklenburg County completed 171,832 transactions (Connaughton Affidavit & Report 5),[11] which means that, on average, each store completed approximately 1,718 transactions that year.

{115} In this same year, Plaintiff completed eighty-eight (88) jewelry transactions in Mecklenburg County. (Connaughton Affidavit & Report 6 tbl.10.)[12]

{116} Plaintiff's total, which amounts to only 0.5% of the total transactions for Mecklenburg County in 2006, is significantly less than the average number of transactions completed by other specialty jewelry stores in Mecklenburg County.

{117} In sum, by either measure, this third factor suggests strongly that Plaintiff has not penetrated the Charlotte market.

{118} The final factor in the "market penetration" test is the amount of product advertising in the relevant market.

{119} While this is a factor for the Court to consider, advertising alone does not establish trademark rights. *Spartan Foods*, 813 F.2d at 1283.

{120} Additionally, a senior user cannot simply show that it has advertised in the relevant market; it must also demonstrate the effect of such advertising to show "that its advertising brought customers from [the relevant market] to its [stores]." *Id.* at 1283–84.

{121} Plaintiff spends the majority of its advertising budget on media in the greater Triad area of North Carolina, which consists of Winston-Salem, Greensboro, and High Point. (Robert Simon Dep. 142:13–143:2.)

---

[11] The Connaughton Affidavit & Report suggests that this figure of 171,832 is an average-per-year figure. (*See* Connaughton Affidavit & Report 5.) Because this figure is used in conjunction with the sales volume figure of $138,578,260 and because that same figure ($138,578,260) appears in Table 5 as representing the total sales volume for Mecklenburg County jewelry stores for 2006 (Connaughton Affidavit & Report 4 tbl.5), however, the Court assumes the figure of 171,832 transactions represents the number of transactions made by specialty jewelry stores in Mecklenburg County in 2006.

[12] In 2007, Plaintiff completed seventy (70) transactions; in 2008, Plaintiff's completed transactions were down to forty (40). (Connaughton Affidavit & Report 6 tbl.10.)

{122} Plaintiff has also advertised in local and/or regional publications, but Plaintiff has presented no evidence of the extent to which these publications reach Charlotte residents. (Robert Simon Dep. 148:22–149:9.)

{123} Based on the record evidence, Plaintiff has done very little by way of advertising directed specifically toward the Charlotte market.

{124} For example, Plaintiff cannot point to any specific television advertisements it has run in Charlotte. (Robert Simon Dep. 135:5–136:7.)

{125} Nor has Plaintiff purchased any billboard advertisements in Charlotte (Robert Simon Dep. 139:20–140:7), although it has placed billboard advertisements "on interstate arteries that residents all over the state constantly travel" in order to "specific[ally] target[] . . . all residents coming from all corners of the state" (Robert Simon Dep. 147:12–148:8).

{126} Moreover, the only radio advertising Plaintiff recalls conducting in the Charlotte market ran five (5) to eight (8) years ago. (Robert Simon Dep. 136:8–137:22.)

{127} Similarly, the only print advertising that Plaintiff undertook in the Charlotte area appeared in a Lake Norman newspaper, but it was discontinued in 2005. (Robert Simon Dep. 143:9–23.)

{128} Plaintiff did advertise in the Charlotte Observer in November 2008. (Robert Simon Dep. 187:2–4.) Because Plaintiff filed its Complaint on 5 November 2008, however, this appears to be "nothing more than a belated attempt or after-the-fact effort to expand its trading area before the [Court's] decision" in this matter, *Weiner King*, 615 F.2d at 526 (internal quotations omitted), which the Court declines to consider.

{129} Finally, Plaintiff asserts that it "advertises and markets itself through other medium that ultimately reaches customers in the Charlotte market, including radio, television, highway billboards, involvement in charitable organizations, and the Internet." (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot. 4 (*citing* Robert Simon Dep. 40–44, 80–84, 186–87, 335–37).)

{130} Plaintiff, however, presents no evidence of the effect, if any, of this advertising on Charlotte consumers. (Robert Simon Dep. 149:10–150:15.)

{131} In sum, because there is no evidence "that [Plaintiff's] advertising brought customers from" Charlotte to its store in Winston-Salem, *Spartan Foods*, 813 F.2d at 1283, this final factor does not support a finding that Plaintiff has penetrated the Charlotte market.

{132} Taking into account the four relevant factors for the "market penetration" test, the Court finds that Plaintiff has not penetrated the Charlotte market.

{133} Plaintiff's claim fares no better under the "zone of natural expansion" test.

{134} With respect to the first factor under this test, Plaintiff's previous business activity has been restricted to one retail store in Winston-Salem since its inception. (Compl. ¶ 3.) As discussed above, Plaintiff has attracted very little business from the Charlotte market. *See supra* ¶¶ 97–103.

{135} Similarly, the second and fourth factors in the "zone of natural expansion" test—previous expansion or lack thereof and "presently-planned expansion"—both support a finding that Plaintiff is not likely to penetrate the Charlotte market.

{136} Plaintiff's business activity has always been limited to one retail store in Winston-Salem, and it has not expanded at any time during its existence. (*See* Compl. ¶ 3.)

{137} Plaintiff contemplated opening a store in the Cornelius area and, to this end, Mr. Simon signed an intent to lease a store in that location in the late 1990s. (Robert Simon Dep. 21:16–22:10.) Plaintiff ultimately decided not to open that store, however. (Robert Simon Dep. 22:13–15.) Thus, this does not constitute previous expansion as contemplated by the "zone of natural expansion" test.

{138} Plaintiff contends that it "has considered opening a store in the Charlotte area" and has in the past conducted at least one feasibility study relative to such an expansion. (Pl's. Reply Mem. Law Supp. Prelim. Inj. Mot. 4–5 (*citing* Robert Simon Dep. 19–25, 28–32, 76–80, 332–35;[13] Pl's. Reply Mem. Law Supp. Prelim. Inj., Ex. 2,

---

[13] While Plaintiff cites these page numbers as support for this proposition in its Reply Brief, pages 19–25 and 28–32 of Mr. Simon's Deposition are not included in Exhibit 10 to Plaintiff's Reply Brief.

at ¶ 6 (hereinafter "Nulman Affidavit"); Pl's Reply Mem. Law Supp. Prelim. Inj., Ex. 13).)

{139} Plaintiff further asserts that these "plans" to open a store in Charlotte are motivated, in part, by the fact that "Mr. Simon has three sons who may involve themselves in the plan for a multi-store organization." (Nulman Affidavit ¶ 13; *see also* Robert Simon Dep. 34:5–35:16.)

{140} There is no evidence, however, that Plaintiff ever followed up on the study or otherwise made any concrete plans to expand into the Charlotte market.

{141} Finally, Plaintiff asserts that its "present plans include to 'broaden [its] reach regionally in the short term with the notion of touching the borders of North Carolina as [its] ultimate goal in the longer term development of [its] retail brand.'" (Pl's. Reply Mem. Law Supp. Prelim. Inj. 5 (*quoting* Nulman Affidavit ¶ 5).)

{142} Again, however, there is nothing to support this claim by way of any concrete steps Plaintiff has taken to implement this expansion throughout the state of North Carolina or, more specifically, into the Charlotte market. (*See* Robert Simon Dep. 31:3–32:10.)

{143} Thus, the second and fourth factors support a finding that Plaintiff is not likely to expand into the Charlotte market.

{144} The third factor—dominance of contiguous areas—also supports a finding that Plaintiff is not likely to expand into the Charlotte market.

{145} There is no evidence showing that Plaintiff dominates the areas contiguous to Charlotte.

{146} To the contrary, Defendants' evidence shows that at least two jewelry stores operating "in areas between or around Winston-Salem and Charlotte" use the name "Windsor." (Defs'. Opp. Pl's. Mot. Prelim. Inj. 8–9 (*citing* Defs'. Opp. Pl's. Mot. Prelim. Inj., Ex. E, at 1–2 (hereinafter "Barefoot Report"[14])).)

---

[14] This exhibit is a report of a private investigator, which was produced in response to a request for "assistance in determining what type of jewelry is being sold at Windsor Gallery located at 1810 West Innes Street, Salisbury, North Carolina 28144." (Barefoot Report 1.)

{147} Specifically, Windsor Salisbury, a jewelry store located in Salisbury, North Carolina, "sells custom fine jewelry including rings, watches, necklaces, stones and other items," and "has been in continuous operation at the same location for approximately 25 years." (Defs'. Opp. Pl's. Mot. Prelim. Inj. 9 (*citing* Barefoot Report 1–2).) Salisbury is almost directly between Winston-Salem and Charlotte.[15]

{148} Finally, there is no evidence of market penetration by Plaintiff "'by means of products brought in from other areas.'" *Spartan Food*, 813 F.2d at 1283 (*quoting Weiner King*, 615 F.2d at 523).

{149} In sum, whether viewed as a function of Plaintiff's "market penetration" or its "zone of natural expansion," Plaintiff does not have a market presence in the Charlotte market sufficient to warrant injunctive relief under the NCTRA or under the common law.

{150} Accordingly, the Court need not determine whether "defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star*, 43 F.3d at 930.

{151} It is also unnecessary to address Defendants' contention that Plaintiff's state trademark registration is subject to cancellation. (*See* Defs'. Opp. Pl's Mot. Prelim. Inj. 2.)

## VI.
## CONCLUSION

{152} The Court **DENIES** Plaintiff's Motion for Preliminary Injunction and dissolves the Temporary Restraining Order currently in place.[16]

**SO ORDERED**, this the 16th day of February, 2009.

---

[15] The Court takes judicial notice of this fact.

[16] This finding is without prejudice to Plaintiff's right to renew its claims should it subsequently establish a sufficient presence in the Charlotte market. *Accord Pizzeria Uno*, 747 F.2d at 1536.